HEDSTROM COMPANY, a subsidiary of Brown Group, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 78–1800, 78–1801.

United States Court of Appeals, Third Circuit.

Argued June 5, 1979.

Reargued En Banc April 28, 1980.

Decided Aug. 6, 1980.

Eugene K. Connors (argued), James S. Cheslock, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for petitioner.

Kenneth Hipp, Washington, D. C. (argued), Janet G. Harner, Pittsburgh, Pa., W. Christian Schumann, Marion Griffin, N. L. R. B., Washington, D. C., for respondent.

Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

These cases are before us on the consolidated petitions of Hedstrom Company, a subsidiary of Brown Group, Inc., to review and set aside two orders issued against it by the National Labor Relations Board and on a cross-petition by the Board for enforcement of these same orders. Two principal issues are presented. First, is the Board's reinstatement of its remedial order of May 12, 1976 that directs Hedstrom to recognize and bargain with the International Association of Machinists and Aerospace Workers (the Union), entered in response to a remand from this Court, within its broad discretion to effectuate the policies of the Na-

tional Labor Relations Act? Second, is there substantial evidence on the record to support the findings by the Board that Hedstrom committed additional unfair labor practices during a strike at the Company's plant in 1976? We conclude in No. 78–1800 that, under the circumstances of this case, enforcement of the bargaining order should not be denied, and in No. 78–1801 that the record does support the findings of unfair labor practices.

## I.

Hedstrom Company manufactures toys and furniture. In early 1974, a union organization campaign was waged at the Company's plant located in Bedford, Pennsylvania. As a result of the campaign, signed authorization cards were obtained from a majority of the plant employees, and on March 28, 1974, an election was held, which the Union lost by a vote of 125 to 113. A number of complaints of unfair labor practices by management personnel were then filed by the Union with the National Labor Relations Board. Following the usual practice, the Board assigned the matter to an Administrative Law Judge (ALJ) for a hearing. The ALJ thereafter filed an opinion on November 19, 1975, finding 42 separate violations of § 8(a)(1) and a single violation of § 8(a)(5) of the National Labor Relations Act, and recommended that the election be set aside and a cease and desist order issue.

After exceptions were filed, the Board affirmed the ALJ's findings of numerous unfair labor practices. Specifically, the Board determined that Plant Manager William Griffiths and nine plant supervisors coercively and unlawfully interrogated employees, solicited employee grievances, promised and granted benefits to employees, conveyed impressions of employee surveillance, and threatened employees with discharge, plant closure, reduced benefits, and more onerous work rules in an attempt to interfere with protected employee organizational rights. In addition, the Board found that, immediately preceding the elec-

tion, Company President Lee Ketcham impliedly threatened the employees with plant closure by declaring that the Company had undergone an "unhappy experience" with the Union at its former plant, and that this implied threat was reinforced by a local newspaper editorial on the day of the election stating that Hedstrom's "bitter experience" with the Union at its former plant had caused the closure of that plant by the Company. Finally, the Board determined that Ketcham unlawfully threatened an employee with discharge and that the Company violated § 8(a)(5) of the Act by refusing to recognize and bargain with the Union. Because it found that the numerous and pervasive violations committed by the Company undermined the Union's support and rendered slight the possibility of conducting a fair second election, the Board also directed Hedstrom to recognize and bargain with the Union.

On Hedstrom's petition for review of the Board's initial order, a panel of this Court on July 5, 1977, affirmed all of the Board's findings of unfair labor practices except the findings that President Ketcham unlawfully threatened an employee with discharge and that the Company unlawfully refused to recognize and bargain with the Union.[1] Partly because of its reversal of these two unfair labor practice findings, but primarily because the Board failed to make "specific findings" regarding the immediate and residual effect of the unfair labor practices and a "detailed analysis" assessing the likelihood of holding a fair re-run election, this Court declined to enforce the Board's order to bargain and remanded the case to the Board for review in light of our rulings. In particular, the prior panel instructed the Board to evaluate the effect of the reversal of the two unfair labor practice findings; to assess the impact on both the election and the chance for a fair rerun election of the front page editorial warning that Hedstrom might move its plant in the event of unionization; and to consider what effect the passage of time would have on the possibility of having a fair second election.

1. *Hedstrom Company v. NLRB (Hedstrom I)*, 558 F.2d 1137 (3d Cir. 1977).

After these events, chronicled in detail in the prior opinion, a labor strike was called at the Hedstrom plant during the summer of 1976 that resulted in several incidents involving company representatives and certain employees. Complaints of additional unfair labor practices arising out of these subsequent episodes were filed with the Board, and the ALJ conducted a further hearing. Following the filing of exceptions to the recommendations of the ALJ on the part of both Hedstrom and the General Counsel, the Board affirmed the findings of the ALJ that Hedstrom had committed additional unfair labor practices. In particular, the Board determined that Hedstrom violated § 8(a)(1) when William Griffiths coercively interrogated Rena Ritchey and solicited grievances from her; when President Ketcham threatened Erma England with onerous working conditions because she had engaged in protected concerted activity; and when Clark Ferguson threatened Delores Casteel with loss of her job and told her that Hedstrom would never sign a contract with the Union. Additionally, the Board found that Hedstrom violated § 8(a)(3) and (1) by refusing to provide Rena Ritchey an offer of reinstatement with a reasonable time for her to respond. Finally, the Board decided that Hedstrom violated § 8(a)(5) by refusing to bargain with the Union and by unilaterally promulgating certain new work rules.

As a result of these findings, the Board ordered the Company to cease and desist from engaging in specified unfair labor practices and from in any other manner interfering with, restraining, or coercing employees in the exercise of their rights under the Act. Affirmatively, the Board directed Hedstrom to offer Rena Ritchey reinstatement and to make her whole for any loss of pay she may have suffered as a consequence of the discrimination practiced against her. The Board's order also required the Company to rescind the work rules that had been unilaterally promulgated, and to post appropriate notices at its facility.

In a separate proceeding, conducted in response to the remand, the Board reconsidered its initial order that directed Hedstrom to bargain with the Union. Relying in part on its findings that Hedstrom had committed subsequent unfair labor practices by coercively interrogating and threatening its employees, as well as on its review of the record in light of the opinion in *Hedstrom I*, the Board filed a supplementary decision and reinstated its original bargaining order. Hedstrom then petitioned this Court to review and set aside both the supplemental order requiring Hedstrom to bargain with the Union, as well as the separate order relating to the subsequent unfair labor practice findings. The Board cross-applied for enforcement of both orders. We now address these two issues.

## II.

The focal point for decisional analysis of the law pertaining to bargaining orders is the Supreme Court's discussion in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In *Gissel*, the Court declared that a bargaining order may appropriately be imposed in place of a new election not only in cases involving outrageous conduct, but also in other than extraordinary cases that are "marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." 395 U.S. at 614–15, 89 S.Ct. at 1940. The Board's authority to issue a bargaining order on a lesser showing of employer misconduct is appropriate when there is also a showing that at one point the union had the support of a majority of employees. In such a case, a bargaining order serves both to effectuate ascertained employee free choice and to deter employer misconduct. Indeed, the Supreme Court emphasized in *Gissel* that once it has been shown that the union has achieved majority status, "effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior." 395 U.S. at 614–615, 89 S.Ct. at 1940.

In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensive-

ness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of easing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue.

.    .    .

*Id.*

■ Because *Gissel* expressly delimits the circumstances in which an order to bargain may be appropriately entered, this Court has required the Board to provide, "at the very least, a statement of the reasons leading the administrative agency to impose a bargaining order." *Kenworth Trucks of Philadelphia v. NLRB*, 580 F.2d 55, 61 (3d Cir. 1978). The primary purpose of this requirement is to assist a reviewing court in determining whether the standards of *Gissel* have been satisfied.[2] Since the propriety of a bargaining order depends upon the existence of certain circumstances, it is fitting for the board to "explain with specificity the results of the unfair labor practices and, in particular, the unlikelihood of a fair election," *NLRB v. Craw*, 565 F.2d 1267, 1272 (3d Cir. 1977), before seeking enforcement of such an order. This is not to say, of course, that a reasoned elaboration of the basis for a bargaining order by itself will assure that a careful weighing of the evidence has occurred, but only that it should help to further such an aim.[3]

The *requirement of a reasoned analysis* setting forth the factors justifying the imposition of a bargaining order, however, was meant neither to burden the Board, nor to "limit the issuance of bargaining orders whenever necessary." *NLRB v. Armcor Industries, Inc.*, 535 F.2d at 245. We have emphasized repeatedly that "an elaborate explanation of the factors giving rise to the conclusion that a bargaining order is needed is not essential." *Kenworth Trucks of Philadelphia v. NLRB*, 580 F.2d at 60. Rather, it is expected only that the Board "estimate the impact [of the unfair labor practices], taking into account the factors in the particular case which are indicative of actual effect or which plausibly, in the light of existing knowledge, would contribute to or detract from an actual impact," and appraise "those factors which might reasonably have a bearing" on the likelihood of a fair rerun election. *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1118 n. 16 (7th Cir. 1973), *quoted in Kenworth Trucks of Philadelphia v. NLRB*, 580 F.2d at 60, and *NLRB v. Craw*, 565 F.2d at 1271, and *NLRB v. Armcor Industries, Inc.*, 535 F.2d at 245.

On the original petition for review of the Board's order to bargain, this Court determined that, because it "did not indicate the reasons it concluded a fair rerun election unlikely, nor did it assess the past history of employer interference," 558 F.2d at 1151 n. 35, the Board's reasoning in support of its order was unduly conclusory. Accordingly, the case was remanded to the Board for an

---

**2.** As a general matter, the NLRB must disclose the foundation of its orders. See *NLRB v. Metropolitan Life Insurance Co.*, 380 U.S. 438, 443, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965); *Kenworth Trucks of Philadelphia v. NLRB*, 580 F.2d 55, 61 n. 4 (3d Cir. 1978). Section 8(b) of the Administrative Procedure Act, 5 U.S.C. § 557(c)(3)(A), provides that decisions by administrative agencies must include "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record . . ."

In addition to promoting the aim of ensuring informed judicial review of the board's bargaining orders, the requirement of a statement of

reasons also has been said to contribute to the "predictability of this important area of labor law" and to provide a "prophylaxis against arbitrary exercise of the Board's power." *NLRB v. Armcor Industries, Inc.*, 535 F.2d 239, 245 (3d Cir. 1976). *See, Kenworth Trucks of Philadelphia v. NLRB*, 580 F.2d 55, 60 (3d Cir. 1978); *NLRB v. Craw*, 565 F.2d 1267, 1271 (3d Cir. 1977); *NLRB v. Eagle Material Handling Co.*, 558 F.2d 160, 167 (3d Cir. 1977).

**3.** See Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267, 1292 (1975) ("The necessity for justification is a powerful preventative of wrong decisions.").

explication of the factors justifying the issuance of the bargaining order. In particular, the Board was instructed to evaluate the effect of the reversal of the two unfair labor practice findings; to assess the effect on both the election and the possibility for a fair rerun election of the front page newspaper editorial warning that Hedstrom might move its plant in the event of unionization; and to consider what effect the passage of time would have on the likelihood that a fair second election would ensure a fair election.

In compliance with the order of remand, the Board reconsidered the record as a whole in light of the requirements enunciated in *Gissel* and set forth in the opinion on the initial appeal. Despite the reversal of two of the unfair labor practice findings, the Board found that Hedstrom's extensive

4. In this regard, the Board made the following specific findings:

With respect to the seriousness of [the Company's] unfair labor practices and the impact one might reasonably expect them to have had on employees, we note at the outset that the possibility of plant closure in the face of unionization was an issue which loomed large in the election campaign. The Board has long held that the threat of job loss through plant closure has a seriously coercive effect on employees' freedom of choice in the election of a collective bargaining representative. Thus, the Board has stated: "Threats of loss of work and income are a type of threat likely to have the most substantial impact upon employee attitudes and reactions." [Citation omitted.]

. . . Further, in *Gissel* . . . the Supreme Court recognized the serious impact of such threats when it made reference to a study which showed that threats to close or transfer plant operations were more effective in destroying election conditions for a longer period of time than were other types of unfair labor practices. [Citation omitted.]

[The Company's] employees were exposed to the threat of plant closure throughout the campaign. The entire Bedford community was aware that [the Company] had recently closed the Fitchburg plant due to the presence of a union. [B]oth high- and low-level supervisors unlawfully raised the Fitchburg example to the employees during the campaign, and impliedly threatened Bedford employees with the same fate in the event that they selected the Union. Indeed, [the Company's] president, Ketcham, ended the campaign with a speech to all employees which raised the spectre of the "unhappy experience" at Fitchburg.

anti-union campaign, together with the large number of remaining unfair labor practices, demonstrated the company's proclivity to exceed the limits of the law in its attempt to prevent unionization.[4] From these findings, the Board specifically inferred that "the total effect of the threats of closure, and the numerous other unfair labor practices against the background of the general awareness of the [Company's previous labor] experience, was to instill in employees a strong fear of loss of employment that would continue to be operative even in the event of a second election." The Board further ascertained, in assessing the impact of the publication on the chance of a fair rerun election, that publication of the editorial could only have exacerbated the employees' fears.[5] In the Board's view,

5. The article in question entitled "Hedstrom Employees to Vote today on Unionization," appeared on the front page of the Bedford Gazette the day of the election, and contained the following statements:

Hedstrom, which was sold to Brown Group, Inc., of St. Louis two years ago, has its headquarters in Bedford. Hedstrom's largest production facility is in Dothan, Ala. The headquarters shift from Fitchburg, Mass., to Bedford, was made to escape what management felt was an untenable union relationship. "A bitter experience," one said. The Hedstroms left Fitchburg—and the union—behind.

\* \* \* \* \* \*

The real issue in the election may be the company's expansion plans. Company officials confirm that the parent corporation, Brown Group, has approved a $1 million addition to the massive plant along Sunnyside Road. . . .

\* \* \* \* \* \*

Hedstrom President E. Lee (Jack) Ketcham told Bedford Rotary a month ago that "It's Bedford's turn to grow." Ketcham said most of the growth in recent years had been at the Dothan, Ala. plant, which is not unionized. When—or if—the expansion will be made could hinge on the union situation, but company officials wouldn't say that. One officer said, "We've all been too busy on this election to think about it."

this was particularly so because previous acts by the company lent credibility to the warning set forth in the editorial.[6]

The Board, in its opinion, recognized its responsibility under *Gissel* to "attempt to measure the impact [of such conduct] over time and, also, to assess the likelihood that any lasting impact can be mitigated by remedies short of an order to bargain." The Board noted in this regard that "[m]erely requiring the employer to refrain from repeating such threats will not, of course, erase the threat from the employees' memory." Further, the Board observed that "the standard remedy for less severe violations—the posting of a notice informing employees that the employer will not repeat in unlawful conduct—often prolongs that impact by insuring that each and every employee is reminded that such a threat was made." In compliance with the dictate of the Supreme Court in *Gissel*, the Board then concluded expressly that "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order . . . ." 395 U.S. at 614–15, 89 S.Ct. at 1940.

Finally, in conformity with the instructions set forth by the Court on the prior appeal, the Board considered the effect of the passage of time on the possibility of a fair second election. In this regard, the Board found nothing in the record to indicate any diminution in the employees' concern that they would lose their jobs should the Union win an election. To the contrary, the Board determined that the effects of

Hedstrom's earlier threats of plant closure were subsequently reinforced by the commission of additional unfair labor practice violations, found by the Board in the companion case. "[R]ecent events," the Board declared, "indicate that respondent's vigorous opposition to the Union continues to result in unfair labor practices, thereby sustaining, reinforcing, or increasing the fear that the company might still carry out its earlier threat to close operations if the Union prevails." Subsequent unfair labor practices, as Judge Wisdom has recently stated for the Court of Appeals for the Fifth Circuit, "are always relevant because they demonstrate that the employer is still opposed to unionization." *Chromalloy Mining and Materials, Etc. v. NLRB*, 620 F.2d 1120, at 1131 n. 8 (5th Cir. 1980). For this reason, consideration of such events by the Board in determining whether to impose a bargaining order has been approved by the courts.[7]

On the basis of these specific findings and after careful consideration of the record on remand, the Board concluded that a bargaining order was still necessary to protect the rights of Hedstrom's employees. The Board possesses "broad discretion to adapt its remedies to the needs of particular situations," in order to effectuate the policies of the Act. *Local 60, United Brotherhood of Carpenters v. NLRB*, 582 F.2d 720, 740 (3d Cir. 1978). And the Supreme Court has made it clear that it is within the province of the Board to determine whether a bargaining order would better protect the interests of employees in a particular case than would an election. As the Court instructed in *Gissel*:

**6.** After reviewing the article in accordance with our instructions, the Board made the following specific findings:

As to the newspaper article which the court has instructed us to consider, it appeared on the morning of the election and recounted the Fitchburg experience and suggested that the Company's expansion plans might be adversely affected by the presence of a union on the scene. Thus, the fears engendered by the implied threats of company officials and supervisors were articulated in an article

published by an independent source. This article would tend to reinforce the employees' belief that [the Company's] threats were not merely campaign rhetoric, but serious admonitions regarding the consequences of unionization [footnote omitted].

**7.** *See e. g., Chromalloy Mining and Minerals, Etc. v. NLRB*, 620 F.2d 1120, at 1131 (5th Cir. 1980); *NLRB v. Drives, Inc.*, 440 F.2d 354, 367 (7th Cir.) *cert. denied* 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971).

It is for the Board and not the courts . . . to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act . . . the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.

395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32.

In our view, this appeal has all of the elements that, as we reiterated only recently, are common to those cases in which we have enforced orders to bargain. *Electrical Products Division of Midland-Ross v. NLRB*, 617 F.2d 977, 987 (3d Cir. 1980); *Rapid Manufacturing Co. v. NLRB*, 612 F.2d 144, 149–50 (3d Cir. 1979). The implied threats at issue were communicated to a "significant percentage of employees in the bargaining unit." *Midland-Ross*, 617 F.2d at 987; *Rapid Manufacturing*, 612 F.2d at 149. Indeed, Company President Ketcham's implied threat of plant closure was made at a meeting involving every Hedstrom employee. Moreover, the unfair labor practices at issue "involved unlawful activity by senior company officials." *Midland-Ross*, 617 F.2d at 987, *id.*; *Rapid Manufacturing*, 612 F.2d at 149. And, because the findings rest "ultimately on a psychological impact on all the employees that is unlikely to dissipate, the factors undermining the first election would be present at any future election." *Midland-Ross*, 617 F.2d at 987. In addition, the imposition of a bargaining order has been held "especially appropriate" where, as here, "the employer has demonstrated a history of opposition to unionization, thus suggesting that he will commit more unfair labor practices in a subsequent election campaign, and . . . the employer has engaged in a discriminatory refusal to recall an employee, thus indicating that his anti-union animus is respon-

sible at least in part for the employee turnover." *Chromalloy Mining and Minerals, Etc. v. NLRB*, 620 F.2d 1120, at 1133 (5th Cir. 1980).

■ Although Hedstrom, in its argument before us, faults the Board for not taking additional testimony or requesting statements of positions or briefs from counsel on remand, the Company itself proffered no evidence, no statements, and no additional briefs in the more than nine months that the case was pending before the Board after this Court's remand on July 5, 1977. Nor did the Company move for reconsideration or for leave to adduce additional evidence after the Board issued its decision on remand on April 28, 1978, as permitted by Board Rules and Regulations. 29 CFR § 102.48(d)(1). Under the circumstances, we find that Hedstrom is precluded from asserting this objection on appeal. 29 U.S.C. § 160(e); *see International Ladies' Garment Workers v. Quality Manufacturing Co.*, 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 975, 43 L.Ed.2d 189 (1975); *Glaziers' Local No. 558 v. NLRB*, 408 F.2d 197, 202–03 (D.C.Cir. 1969).

*Hedstrom I* merely instructed the Board to consider on remand what effect the passage of time would have on the possibility of having a fair second election. Nothing in the order imposed upon the Board any obligation to conduct a further hearing or to adduce additional evidence. Indeed, to require the Board to determine whether a continuing majority supports unionization would be "to put a premium upon continued litigation by the employer." *NLRB v. L. B. Foster Company*, 418 F.2d 1, 4 (9th Cir. 1969). For an employer, particularly one with a rapid turnover rate, could hope that the resulting delay would produce a new factual situation which the Board would then have to consider. In this manner, the employer would be able to avoid any bargaining obligation indefinitely.[8]

---

8. Moreover, as Judge Wisdom recently put it, "the union would assume the role of Sisyphus, condemned in Hades continually to roll a stone up a hill, only to find that it slides down again before reaching the top." *Chromalloy Mining*

*and Minerals, Etc. v. NLRB*, 620 F.2d 1120, at 1132 (5th Cir. 1980).

Although substantial employee turnover may well be relevant to the Board's choice of remedy, "the Board may determine that other con-

An additional argument sometimes advanced against bargaining orders is that their issuance deprives employees of their right to vote and forces them into unions contrary to their own wishes. Opponents thus assert that it is the employees who are the real victims of such orders to bargain. "In the last analysis, however," as one scholar has observed, "those who would resist this remedy in the name of the employees must answer for the employees whose free choice is currently impaired by the lack of adequate remedies."[9] On occasion, traditional remedies, such as the posting of notices or the possibility of reinstatement with back pay, will not allay adequately worker apprehensions caused by the employer's flagrant unfair labor practices. Such fears may dissipate majority strength and, as a result, union elections may be lost or postponed for substantial periods of time pending litigation. To the extent that an order to bargain will help to deter the commission of such unfair practices, "there is good reason to believe that the net effect [will] be to promote, and not impair, the legitimate interests of employees as a whole."[10]

■ There is no dispute in this case that the Union at one time enjoyed the support of the majority of the employees, as evidenced by signed authorization cards. And while the dissent's position may represent a reasonable view of the record, we cannot say that the Board's factual determinations in this regard are not supported by substantial evidence. Recognizing that "it is not

our function to substitute our judgment for the Board's on the propriety of a bargaining order," *NLRB v. Armcor Industries, Inc.*, 535 F.2d at 245, we hold that these determinations constitute a sufficient showing of employer misconduct, under the circumstances, so as to render the imposition of a bargaining order not inappropriate. Hence, we will deny the petition for review and enforce the order of the Board that the Company recognize and bargain with the Union upon request.

### III.

In the related proceeding, the Board found that Hedstrom had committed additional violations of § 8(a)(1) by coercively interrogating Rena Ritchey regarding her union activities, by threatening Erma England with onerous working conditions in retaliation for her assistance to the Union, and by threatening Delores Casteel with loss of employment because of her active union support. •

According to the principles set forth in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the scope of an appellate court's review of the Board's findings regarding unfair labor practices is limited to the determination whether the findings are supported by substantial evidence on the record as a whole. "Substantial evidence" has been defined by the Supreme Court as simply "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[11] A

siderations, such as 'past union activity, employer responses to such activity, and expressions of employee sentiment such as the signing of union cards,' . . . requires the imposition of a bargaining order even when substantial turnover has occurred." *Id.* (quoting in part *Bandag, Inc. v. NLRB*, 583 F.2d 765, 773 (5th Cir. 1978).

**9.** Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act*, 78 Harv.L.Rev. 38, 135 (1964). Moreover, as then Professor Bok pointed out, the Board's order to bargain will not necessarily compel the employees to join the union or pay dues unless a union security clause is negotiated. However, "[a]n employer who will violate the law to resist unionization

is an unlikely prospect for a union security clause, and it will be difficult to pressure him into making this concession when the majority of employees are opposed. . . . Still more important, there is every reason for the union to negotiate a contract that will satisfy the majority, for the union will surely realize that it must win the support of the employees, in the face of a hostile employer, in order to survive the threat of a decertification election after a year has passed." *Id.* at 136.

**10.** *Id.* at 136.

**11.** *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (quoting *Consolidated Edi-*

court should defer to the Board's determination under this restrictive standard of review, even when the court itself would be inclined to adopt a different interpretation of the evidence.

■ To a significant extent, such deference reflects a judicial recognition of the NLRB's role as an agency "presumably equipped or informed by experience to deal with a specialized field of knowledge." *Universal Camera Corp. v. NLRB*, 340 U.S. at 488, 71 S.Ct. at 465.[12] But judicial deference to factual determinations rendered by the Board is not limited to those areas peculiarly within the Board's competence. Congress specifically provided that: "[T]he findings of the Board with respect to questions of fact is supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e) (1976). And the Supreme Court has expressly instructed that, "[e]ven as to matters not requiring expertise," an appellate tribunal may not "displace the Board's choice between two fairly conflicting views" of the evidence, although "the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. NLRB*, 340 U.S. at 488, 71 S.Ct. at 465.

■ In light of these principles, and after considering all of the evidence bearing upon the additional charges of unfair labor practices on the part of Hedstrom, we have concluded that the Board's findings should not be disturbed.

Section 8(a)(1) prohibits an employer from interfering with, restraining, or coercing its employees in the exercise of protected concerted activities. To establish a violation of this provision, "it need only be shown that 'under the circumstances existing, [the employer's conduct] may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act.' "[13] It is well settled that an employer breaches § 8(a)(1) by interrogating employees about their union sympathies, when doing so suggests to the employees that the employer may retaliate because of those sympathies.[14] It is equally well settled that an express or implied promise to remedy the grievance if the Union is rejected, also constitutes a transgression of § 8(a)(1).[15]

The record in this proceeding shows that Hedstrom's plant manager, William Griffiths, approached Ritchey, a union member and striker, and asked her if she knew the purpose of the scheduled union meeting. When Ritchey answered that she did not, Griffiths proceeded to question Ritchey regarding her "problems in the factory." In response to the grievance solicited from Ritchey that the employees had no one with whom they could discuss problems in confidence, Griffiths promised that such matters would "be handled differently" by the company's "new personnel."

This exchange occurred during a discussion of the employee's union activities. Moreover, it took place in a context that included previous coercive interrogatories

son Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

12. *See, e. g., Unemployment Compensation Commission v. Aragan*, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946).

The assumption that the NLRB possesses a special expertise to determine the impact of employer conduct on the exercise of employee rights has been criticized. *See, e. g.,* Getman and Goldberg, *The Myth of Labor Board Expertise*, 39 U.Chi.L.Rev. 681 (1972); Samoff *NLRB Elections: Uncertainty and Certainty*, 117 U.Pa.L.Rev. 228 (1968). We had occasion only recently, however, to reemphasize our obligation to accord deference to the presumed expertise and experience of the Labor Board in the area of unfair labor practices. *Dow Chemi-*

cal Company v. U. S. E. P. A., 605 F.2d 673, 681 (3d Cir. 1979).

13. *NLRB v. Armcor Industries, Inc.*, 535 F.2d at 242, (quoting *Local 542, International Union of Operating Engineers v. NLRB*, 328 F.2d 850, 852–53 (3d Cir. 1964), cert. denied, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964)).

14. *Hedstrom Co. v. NLRB, Hedstrom I*, 558 F.2d at 1143, n. 13; *NLRB v. Armcor Industries, Inc.*, 535 F.2d at 242.

15. *Hedstrom Co. v. NLRB, Hedstrom I*, 558 F.2d at 1142 n. 12; *Landis Tool Co., Div. of Litton Industries v. NLRB*, 460 F.2d 23, 24–25 (3d Cir. 1972), cert. denied, 409 U.S. 915, 93 S.Ct. 237, 34 L.Ed.2d 177 (1972).

of employees regarding union activities and previous solicitations by company officials for the purpose of inducing employees to abandon such activities. Given the absence of any attempt by the company to offer a legitimate explanation of its interest in discovering the reason for the union meeting, as well as the lack of any assurance that Hedstrom would not retaliate against Ritchey because of her union activities, we find that there is substantial evidence to support the Board's finding that Griffiths' conversation with Ritchey amounted to a violation of § 8(a)(1).

As to the finding that Hedstrom abridged § 8(a)(1) by threatening England, the record attests that Hedstrom's president, Lee Ketcham, viewed England as an active striker who had exhibited "a very foul mouth" during the strike. On the day the striking employees returned to work, Ketcham accused England of having "harassed an awful lot" of her fellow workers, reiterated to her the company's work rules, and emphatically told her that she should "stay in [her] work area." The ALJ concluded that Ketcham's remarks were designed not to threaten England but rather to reduce the possibility of friction in the plant. The Board declined to adopt this finding, however, and determined instead that, under the circumstances, Ketcham's actions violated § 8(a)(1) because they conveyed the message that Hedstrom "viewed England as a troublemaker and would enforce the work rules more stringently against her than against other employees."

The dissent would hold that because "the General Counsel lodged no exception to the ALJ's finding about the alleged threat to England," the Board lacked the authority to review this issue. Yet the very first exception taken by the General Counsel was to the ALJ's finding that Hedstrom "did not violate § 8(a)(3) and (1) of the Act" by its actions toward England.[16] Even if this exception were perceived as not complying with the requirements set forth in the regulations,[17] however, this would not preclude the Board from reviewing the issue raised. It would simply permit the Board, in its discretion to disregard the matter.[18]

■ Even assuming *arguendo* that the General Counsel did not take a proper exception to the finding in question, we nonetheless differ from the position taken by the dissent that the statute and the Board's own regulations dictate that unless an exception to a finding of the ALJ is filed, the finding is final and cannot be reversed by the Board. Section 10(c) does state that "if no exceptions are [specifically] filed," "[the ALJ's] recommended order shall become the order of the Board."[19] But the immediately succeeding subsection expressly provides that "[u]ntil the record in a case shall have been filed in a court, . . . the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside in whole or in part, any finding or order made or issued by it."[20] To construe these provisions as foreclosing the Board from reviewing its own findings, or those of the ALJ, at least in a case such as this in which the issue in question has

16. The consolidated complaint issued by the General Counsel alleged that Hedstrom separately violated § 8(a)(1) by threatening Erma England with onerous working conditions and § 8(a)(3) by imposing such onerous working conditions on her. Only the finding of the 8(a)(1) violation is at issue here.

17. 29 C.F.R. § 102.46(b) (1978) provides in part:
(b) Each exception (1) shall set forth specifically the questions of procedure, fact, law, or policy to which exceptions are taken; (2) shall identify that part of the administrative law judge's decision to which objection is made; (3) shall designate by precise citation of page the portions of the record relied upon; and (4) shall state the grounds for the

exceptions and shall include the citation of authorities unless set forth in a supporting brief.

18. 29 C.F.R. § 102.46(b) (1978) provides further:
Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be deemed to have been waived. Any exception which fails to comply with the foregoing requirements may be disregarded.

19. 29 U.S.C. § 160(c) (1976).

20. 29 U.S.C. § 160(d) (1976).

been placed before the Board in connection with the exceptions taken to other aspects of the ALJ's decision, would be to circumvent their literal meaning and unduly to constrain the board in its administration of the Act.

Nor do we believe that the Board's review and reversal of the ALJ's finding was prohibited by the Board's own regulation that "[n]o matter not included in exceptions or cross-exceptions may thereafter be argued before the Board."[21] We adhere, instead, to the approach espoused by the Fifth Circuit that "[e]ven absent an exception, the Board is not compelled to act as a mere rubber stamp for its Examiner,"[22] at least not when the issue has been placed before the Board, as it was here. Thus "[t]he Board was free to use its own reasoning and was not bound by that of the Examiner."[23]

In addition the Board is not in any way inhibited by inferences drawn by the ALJ. To the contrary, the authority to draw legitimate inferences from proven facts is exclusively the Board's, not the ALJ's or the court on review of the Board's order. Indeed, we have consistently held that "the Board has the power to draw different conclusions from evidentiary facts" presented to the ALJ, including conclusions that directly contradict those reached by the ALJ. *NLRB v. Local No. 42, Int. Ass'n of Heat and F. I. A. Workers*, 469 F.2d 163, 165 (3d Cir. 1972); *accord, International Union of Elec. Radio and Machine Workers v. NLRB*, 273 F.2d 243, 247 (3d Cir. 1959). If more than one inference may be drawn from a given set of facts, therefore, the conclusion of the Board will control unless it is unreasonable. Because we cannot say that the inference drawn by the Board—that Ketcham's actions "con-

veyed the message that Hedstrom viewed England as a troublemaker and would enforce its work rules more stringently against her than against other employees" —is any less reasonable than that drawn by the ALJ, we will enforce this finding of the Board.

Similarly, we also find substantial evidence to support the determination that Hedstrom committed an additional abridgement of § 8(a)(1) by threatening Delores Casteel with loss of employment because of her union activities. The record shows that Clark Ferguson, a company supervisor, accosted Delores Casteel, a union committee member and striker, in a bar. After calling Casteel "a scab," Ferguson told her that she would "have no job" if she sought to return to the plant, and that she and her fellow employees would "never get a contract" with the company.

It is firmly established that an employer commits a violation of § 8(a)(1) by threatening employees with discharge because of union activities[24] or by indicating to employees that their union activity will not succeed.[25] The dissent readily concedes that Ferguson's statements, if "taken alone, . . . could well be viewed as threatening an employee with discharge and tending to emphasize futility in union activity." Nonetheless, the dissent would decline to enforce the Board's conclusion that Ferguson's actions constituted an unfair labor practice, in part, apparently, because Casteel was not coerced by Ferguson's statements. "The test of coercion and intimidation," however, as our Court has frequently stated, "is not whether the misconduct proves effective [but] whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees . . . ."[26]

21. 29 C.F.R. § 102.46(h) (1978).

22. *NLRB v. WTVJ, Inc.*, 268 F.2d 346, 348 (5th Cir. 1959).

23. *Id.*

24. *See, e.g., NLRB v. S.E. Nichols-Dover, Inc.*, 414 F.2d 561, 563 (3rd Cir.), cert. denied, 397 U.S. 916, 90 S.Ct. 919, 25 L.Ed.2d 96 (1968).

25. *See, e.g., NLRB v. Sky Wolf Sales*, 470 F.2d 827, 803-31 (9th Cir. 1972).

26. *NLRB v. Triangle Publications, Inc.*, 500 F.2d 597, 598 (3d Cir. 1974) (quoting *Local 542, Operating Engineers v. NLRB*, 328 F.2d 850, 852-53 (3d Cir.), cert. denied, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964)).

In support of its position, the dissent relies additionally on Casteel's own testimony that she told Ferguson that he was drunk and that he didn't know what he was talking about. As we see it, however, these observations do not justify the substitution, for the inference drawn by the Board, of the dissent's own inference that this was simply "an isolated personal barroom exchange between company employees with sharply different views." Rather, we believe, these two positions represent fairly conflicting interpretations of the evidence. Under the applicable standard of review, we are therefore obliged to defer to the Board's determination despite the dissent's inclination to draw a different conclusion from the evidence.

■ In addition, we will enforce that portion of the Board's order finding that Hedstrom violated § 8(a)(3) by refusing to reinstate Rena Ritchey and requiring Hedstrom to make Ritchey whole for the loss of pay suffered as a result of Hedstrom's discrimination against her. The Board concluded that following the termination of the strike, Ritchey was entitled to receive a valid offer of reinstatement from Hedstrom. The Board determined further that Hedstrom violated the Act by failing to provide Ritchey an offer of reinstatement with a reasonable time for her to respond. Consequently, it ordered that Hedstrom reinstate Ritchey and compensate her for the loss of pay resulting from that violation.

Section 10(c) of the Act expressly authorizes the Board "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]: *Provided*, That where an order directs reinstatement of an employee, back pay may be required of the employer . . . responsible for the discrimination suffered by him."[27] Moreover, it is settled that the purpose of a back pay order is to vindicate the public policy embodied in the Act and to deter further encroachments on the labor laws by making employees whole for losses suffered on account of an unfair labor practice.[28] Accordingly, we hold that the back pay order was not an inappropriate exercise of the Board's legitimate authority.

■ Finally, we conclude that there is also substantial evidence in the record to support the Board's determination that Hedstrom violated § 8(a)(5) and (1) by refusing to bargain with the Union and by unilaterally promulgating new work rules. Section 8(a)(5) of the Act prohibits an employer from refusing to bargain with the designated collective bargaining representative of its employees.[29] That an employer violates § 8(a)(5) and (1) if he makes announcements concerning work conditions which contain material changes from existing conditions without consulting with the employees' bargaining representative is well established. *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); *Marine & Shipbuilding Workers v. NLRB*, 320 F.2d 615, 620 (3d Cir.), cert. denied, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1963). In addition, an employer violates § 8(a)(5) and (1) if he makes announcements concerning work conditions which, even if they do not contain material changes from existing conditions, are designed by their timing and wording to undermine the employees' bargaining representative. *Flambeau Plastics Corp. v. NLRB*, 401 F.2d 128, 134 (3d Cir.), cert. denied, 393 U.S. 1019, 89 S.Ct. 625, 21 L.Ed.2d 563 (1968); *NLRB v. George ·P. Pilling & Son Co.*, 119 F.2d 32, 38 (3d Cir. 1941). Whether an employer's announcements concerning work conditions are viola-

**27.** 29 U.S.C. § 160(c) (1976).

**28.** *See, e. g., NLRB v. Dodson's Market, Inc.*, 553 F.2d 617 (9th Cir. 1977); *NLRB v. Frick Co.*, 397 F.2d 956 (3d Cir. 1968).

**29.** Section 8(a)(5) provides that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with the representative of his employees." "To bargain collectively" is defined by § 8(d) as "the performance of the mutual obligation . . . to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . .''

tive of § 8(a)(5) because they either contain material changes from existing conditions or are designed to undermine the employees' bargaining representative, is a question of fact for the Board and its determination is binding on a reviewing court if supported by substantial evidence. *NLRB v. George P. Pilling & Son Co.*, 119 F.2d at 33.

The original order requiring Hedstrom, upon request, to recognize and bargain with the Union with respect to wages, hours, and other terms and conditions of employment was issued on May 17, 1976. Shortly thereafter, the Union officially demanded recognition and requested that Hedstrom bargain with the Union as the employees' exclusive collective bargaining representative. Subsequently, on June 16, 1976, the Company formally rejected the Union's request, and on September 13, 1976, it promulgated certain work rules pertaining to the terms and conditions of employment, without notifying or consulting with the Union.

Hedstrom argues against this charge that these alleged new work rules merely reiterated certain provisions that were already in existence. But while the existing rules simply stated that all employees "are required to be at their work place . . . at starting times and remain there until times of ending work," the new rules specifically stated that all employees "without exception must be at their assigned work stations except for: (a) authorized rest periods; (b) lunch period; [and] (c) personal needs when permission has been requested of and granted by your supervisor" and that " '[w]andering' around the plant, congregating at vending machine areas and . . . in rest rooms at other than these allocated times are prohibited." Moreover, unlike the existing rules which allowed all of the employees to take their coffee breaks at the same time, the new rules required the employees to take their coffee breaks on a staggered department-by-department basis to "reduce . . . congestion that occurs at the vending machines and rest areas during break periods." Furthermore, the record shows that while the company previously had often neglected to enforce this and other rules and failed to state what

disciplinary measures it would use to enforce the rules, the new rules contained language not present in the prior rules to the effect that the company would enforce the new rules "immediately" and that it would use disciplinary measures, "including discharge," in doing so.

The Board affirmed the ALJ's finding that these new rules did not merely reiterate prior rules, but instead contained "obvious and substantial differences." In our view, substantial evidence on the record supports this determination. We also find substantial evidence to support the finding that the promulgation of these new rules was designed to undermine the Union. The rules were announced to the employees just as the strikers returned from the strike caused by the Company's refusal to bargain with the Union. And the announcement itself explicitly stated that the new work rules were designed to counter the effect of "sharply divided opinions and attitudes" associated with efforts by employees to support the Union on the need for "a safe and orderly place of work." Under these circumstances, the inference drawn by the Board that promulgation of the rules was designed to undermine support for the Union does not seem unreasonable.

Assuming *arguendo* that it did unilaterally promulgate new work rules, the Company contends alternatively that such action would not constitute a violation of § 8(a)(5) because the bargaining order then in effect was subsequently set aside by this Court. In reinstating its order in compliance with our instructions on remand, however, the Board specifically designated February 15, 1974, the day on which the Union achieved majority status and the eleventh day after the Company began its unfair labor practices, as the effective date of Hedstrom's obligation to bargain. Only recently, we reaffirmed that the Board may properly make a bargaining order retroactive to a date on which the Union had achieved majority status and by which the unfair labor practices which give rise to order had begun. *NLRB v. Daybreak Lodge Nursing & Convalescent Home, Inc.*, 585 F.2d 79, 82–83

(3d Cir. 1978); *accord, NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 170 (3d Cir. 1977). Accordingly, we hold that Hedstrom's unilateral promulgation of the new work rules subsequent to February 15, 1974, the effective date of its obligation to bargain with the Union, did constitute a § 8(a)(5) violation.[30]

### IV.

Hedstrom's consolidated petitions for review will be denied, and the orders of the Board will be enforced.

ROSENN, Circuit Judge, dissenting.

The majority opinion, under the rubric of judicial deference, approves of the imposition of a bargaining order without a shred of evidence that a rerun election is impractical. Because I believe that the Board's order lacks a reasonable basis in law and is unsupported by substantial evidence, I respectfully dissent.[1]

The Board's explanation for the extraordinary remedy of a bargaining order is unacceptable because it is not predicated upon factual determinations but is structured upon speculation built on speculation. For example, the Board concludes, without any factual evidence to support the conclusion, that the total effect of threats of plant closure during the campaign "was to instill in employees a strong fear of loss of employment that would continue to be operative in the event of a second election." This is speculation of the highest rank because (1) there is no real evidence that a substantial portion of the work force was affected by "strong fears of the loss of employment" engendered by management threats, and (2) the record does not show the composition of the work force four to five years later. How many of the present work force knew

of the previous threats? What is there in this record to show that the employees retain any fears that would affect their ability to freely cast a ballot in a second election conducted by the Board?

The Board apparently believed it was properly punishing the company for engaging in unfair labor practices. Such a simplistic approach, however, ignores the fact that the real victims of the bargaining order are the employees. The employees, many of whom were not in the work force during the election, are being punished for they are being deprived of their right to vote and they are being represented by a bargaining agent they may not desire. I believe the majority errs when it "defers" to alleged Board "expertise" under the facts of this case.

### I.

Over six years ago, on March 28, 1974, a representation election was conducted for the employees of Hedstrom. Following the election which the Union lost by a vote of 125 to 113, unfair labor practice charges were lodged against the employer. After an NLRB administrative law judge (ALJ) held hearings on the campaign and election, he concluded that the company had committed unfair labor practices and that the election should be set aside. Although noting that the company had threatened to close the plant if the Union won, the ALJ evidently viewed Hedstrom's transgressions as "numerous" but not major. The ALJ rejected the contention that the unfair labor practices warranted a bargaining order. Having heard the testimony of the witnesses, he concluded that the employer's unfair labor practices could be remedied by an appropriate cease-and-desist order and were

---

30. "That the employer did not originally understand the full consequences of its illegal acts," as we stated in *NLRB v. Daybreak Lodge Nursing & Convalescent Home, Inc.*, 585 F.2d at 83, "does not prevent the issuing of a bargaining order and should not, we believe, prevent that order from being made effective as of the date here." In this case, however, since a valid bargaining order, albeit one that was subsequently vacated, was in effect at the time of the promulgation of the new work rules, it would seem that Hedstrom is precluded from offering this argument.

1. As for the subsidiary issue of the reinstatement of Ritchey with back pay, I concur with the majority. I disagree with the majority's enforcement of the remaining unfair labor practices.

not so serious as to preclude a board supervised rerun election.

The Board cursorily reversed the ALJ's decision and issued a bargaining order. In granting that order, the Board relied on *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). According to that decision, once a Union enjoys the support of a majority of employees as indicated by authorization cards, and unfair labor practices by the employer undermine this majority and leave only a slight chance for a fair rerun of the election, the Board may order the employer to bargain with the Union. *Id.* at 614, 89 S.Ct. at 1940.

When we first reviewed the bargaining order issued to Hedstrom, we remanded for an explanation of the specific reasons why a new election could not be held. *Hedstrom Co. v. NLRB*, 558 F.2d 1137 (3d Cir. 1977). See *NLRB v. Armcor Industries, Inc.*, 535 F.2d 239 (3d Cir. 1976). Further proceedings before the ALJ and the Board followed. However, the Board did not take additional testimony; it did not request position statements or briefs from counsel on remand. In April 1978 the Board found that Hedstrom had committed additional unfair labor practices since the first bargaining order. Referring to the original violations and the subsequent unfair labor practices, the Board proceeded to draft an explanation for its second bargaining order. The principal issue now before this court is the sufficiency of that explanation.

II.

The justification advanced by the Board must be examined in light of the paramount principle that the preferable way to measure employees' support for a union is by secret election. Otherwise a union, unwanted by either the employer or the employees, may be foisted upon a company. Although *Gissel* approves the Board's resort to authorization cards as a gauge under limited circumstances, the opinion leaves no doubt that, when possible, an election should be held. 395 U.S. at 603–04, 89 S.Ct. at 1934–1935. This preference for the elections is a cornerstone of labor relations.

Elections permit employees to express their personal preferences by secret ballot in the highly critical determination as to who, if anyone, will exclusively represent them in collective bargaining. The secrecy of the ballot most effectively wards off the pressures created by the advocates for and the opponents of the union; it insulates employees from intimidation by either union organizers or the company. The relative formality of an election, supervised by NLRB agents, as contrasted with the informal solicitation of authorization cards, and whatever unknown representations are made in the process, may impress employees as to the seriousness of their choice and the necessity for deliberation. After a campaign in which both the union and the company debate the merits of unionization, employees can make a more informed choice than when they informally sign authorization cards based solely on union representation. Authorization cards are not foolproof and their solicitations are not always free from misrepresentation or pressure. It is the independent, deliberate, secret, and informed choice of employees—the choice made in an election—to which the Board should, whenever possible, give effect.

> [D]emocracy in industry must be based upon the same principles as democracy in government. Majority rule, with all its imperfections, is the protection of workers' rights, just as it is the surest guaranty of political liberty that mankind has yet discovered.

Senator Robert Wagner paraphrasing Lloyd K. Garrison, former chairman, National Labor Relations Board, 79 Cong.Rec. 7571 (1935).

Judged in light of the preference for elections, the Board's bargaining order in this case is a misapplication of *Gissel* and is unsupported by substantial evidence. Under *Gissel*, as interpreted by this court in *NLRB v. Armcor Industries, Inc., supra*, the Board may issue a bargaining order here only if unfair labor practices have so corrupted conditions at the Hedstrom plant that, even with the passage of time, a fair election could not be held. The Board at-

tempts to satisfy this standard by the following argument: in 1974 Hedstrom committed unfair labor practices that precluded a fair election then, and because of subsequent unfair labor practices "the passage of time has not increased the likelihood that a fair second election can be held." As the Board wrote in its Supplemental Decision and Order,

> [T]he effect of [Hedstrom's] threats of plant closure and its extensive unfair labor practices during the course of the campaign was to instill in employees the fear that they would lose their jobs through plant closure if the Union won the election. There is nothing to indicate that this fear has been erased during the past 3 years. To the contrary, recent events indicate [Hedstrom's] vigorous opposition to the Union continues to result in unfair labor practices, thereby sustaining, reinforcing, or increasing the fear that the Company might still carry out its earlier threat to close operations if the Union prevails.

As I have already indicated, this is sheer speculation. The facts do not substantiate this argument. I doubt that the record in this case shows that a new election could not have been conducted in 1974; it certainly does not show that a fair election was precluded when the bargaining order was issued in 1978.

As the ALJ recognized in his decision concerning the 1974 violations, Hedstrom's unfair labor practices were numerous. With the exception of the threat to close the plant, however, the violations were not, in his view, "extensive" in terms of their weight and effect. He concluded that even the threat of closure did not preclude a fair election:

> Here, the Union obtained 133 authorization cards. It polled 113 votes. Thus, even if the assumptions are made that all 133 persons who placed their names on the Union's authorization cards did so

because they wanted representation and that all 20 of those who changed their minds were coerced into doing so by [Hedstrom's] unfair labor practices, [Hedstrom] dissipated only 15 percent of the Union's majority. The impact of unfair labor practices of such limited effectiveness is not sufficiently lingering to justify a finding "that the possibility of erasing the effects . . . and ensuring a fair . . . rerun . . . by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order."

(Footnote omitted quoting *NLRB v. Gissel Packing Co., supra*, 395 U.S. at 614–15, 89 S.Ct. at 1940.)

In neither its original decision nor its opinion after remand has the Board answered these persuasive findings.[2] On the basis of the Board's failure to repudiate the findings of the ALJ, there is serious doubt that Hedstrom's violations would have prevented a fair rerun election, even in 1974.

In view of this doubt, what is for me decisive is the Board's failure to point to actual evidence rather than mere speculation that the effects from the 1974 violations continued to afflict Hedstrom's employees when the Board issued its second opinion in 1978. The Board rested its conclusion on additional unfair labor practices which it found Hedstrom had committed since 1974. I turn to these alleged violations.

The Board specifically pointed to four unfair labor practices which it said had taken place since 1974 and had continued the effects of the 1974 violations: (1) the discharge of Rena Ritchey; (2) the interrogation of Ritchey; (3) the incident involving Clark Ferguson and Delores Casteel; and (4) the threat that Erma England would be assigned more burdensome condi-

2. Although our standard of review is not altered when the Board reaches a conclusion different from that reached by the ALJ, the Supreme Court in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951), has noted that evidence supporting the Board's conclusion may be viewed as being "less substantial" in such circumstances. *NLRB v. PPG Industries*, 579 F.2d 1057, 1058 (7th Cir. 1978).

tions for work.[3] I agree with Judge Adams that we should sustain the finding concerning the discharge of Ritchey, ordering reinstatement with back pay. However, there is nothing whatever in her discharge which has the slightest evidentiary value to support the Board's inability to conduct a fair election. Her discharge grew out of a failure on her part to respond to a recall to work following a work stoppage. I disagree with the majority's enforcement of the Board's findings as to the incident involving Ferguson and Casteel and believe that the Board's finding about a threat to England is also insupportable.

Two nights after the strike was called off, a minor company supervisor, Clark Ferguson, encountered Delores Casteel, a Union employee, in a bar. Ferguson, who obviously had been drinking heavily, called Casteel "a scab," told her the Union would never get a contract and concluded by saying that she "had no job." Taken alone, this language could well be viewed as threatening an employee with discharge and tending to emphasize futility in Union activity. *NLRB v. Varo, Inc.*, 425 F.2d 293, 299 (5th Cir. 1970). However, in context, it is clear that Casteel did not labor under any threat of discharge from Ferguson's drunken remarks and that Ferguson acted in excess of his authority. It is conceded that Casteel knew that Ferguson was drunk; that he was not her supervisor or in any way connected with company employment policy; that she did have a job, because that same afternoon she had been called back to work by a company official; and, finally, that Ferguson was so drunk he did not know what he was talking about.[4]

Under the circumstances, I can find no substantial evidence supporting a conclusion that Casteel was in any way coerced, nor in any way threatened in a manner tending to

discourage Union activity. I view the Ferguson-Casteel incident as an isolated, personal barroom exchange between company employees with sharply different views. The company was completely divorced from complicity for this barroom incident and should not be held responsible. Accordingly, I would reverse the finding of the Board in this respect.

As for the alleged threat to England, the ALJ found that the conversation was not coercive. Both section 10(c) of the Labor-Management Relations Act and the Board's own regulations dictate that unless an exception to a finding of the ALJ is filed, the finding is final and cannot be reviewed by the Board. 29 U.S.C. § 160(c) (1976); 29 C.F.R. §§ 102.46(h), 102.48(a) (1978). Although the General Counsel lodged no exception to the ALJ's finding about the alleged threat to England, the Board overturned that finding and determined the conversation violated section 8(a)(1). In taking this action, the Board disregarded both the statute and its own regulations, which vouchsafe to parties appearing before it a full opportunity to be heard on questions that the Board is deciding. Even if the statute were not implicated, the rules afford procedural rights, which the Board may not ignore. *See Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974). I would therefore hold that the alleged threat to England was not within the authority of the Board to consider. *See NLRB v. International Union of Operating Engineers, Local 66*, 357 F.2d 841, 845–46 (3d Cir. 1966).

Pared of its insupportable findings of fact, the Board's conclusion of lingering effects rests on the questioning of one employee, Ritchey, and her later discharge under circumstances indicating her own par-

---

**3.** The majority also alludes to a fifth violation found by the Board: Hedstrom had allegedly promulgated new work rules without consulting the Union. But the Board did not cite that violation as support for the bargaining order. Furthermore, in the absence of a collective bargaining agreement or valid bargaining order at the time, there was nothing to preclude the company from adopting such work rules—

rules which were substantially similar to those which had been in existence for many years.

**4.** I think I (Casteel) said "You're drunk and you don't know what you're saying." " * * * because *if he wouldn't have been drunk, I don't think he would have been saying it.*" (Emphasis added.)

tial fault. I do not discern any warrant for the Board's conclusion that these two events have sustained since 1974 the taint of the original unfair labor practices in such a degree that even now an election cannot be held. As the ALJ demonstrated, the 1974 unfair labor practices eroded, at the most, 15 percent of the Union's majority. Without more, I fail to perceive how the interrogation and discharge of this employee, herself partially at fault, provides substantial evidence for the view that the effects of Hedstrom's violations had not sufficiently abated to allow a fair election by 1978.

This case is not unlike *L'Eggs Products Inc. v. NLRB*, 619 F.2d 1337 (9th Cir. 1980), where the employer allegedly engaged in threatening activities prior to a Union election. The Union lost the election and filed charges of unfair labor practices. The ALJ found that the company's "campaign against the Union included coercive interrogations of employees [and] threats of more onerous working conditions." The Board affirmed the findings and imposed a bargaining order. The Ninth Circuit, in ordering the Board to reconsider the bargaining order, concluded that the discharge of two employees could not provide the sole basis for the Board's order.

In this case the Board has not attempted to assess how the interrogation and discharge of Ritchey—even the other alleged unfair practices—could possibly interfere with the freedom of choice of employees in a Board-supervised, secret election. Indeed, no possible effect could be perceived. The ALJ made an assessment and, reached a negative conclusion. The Board's conclusion on the necessity for a bargaining order is not grounded on the evidence but on sheer unsupported conjecture. In criticizing the reliance on assumptions underlying the Board's regulation of campaign tactics, Judge Skelly Wright, writing for the D.C. Circuit, observed that the Board was suffering

from the obvious self-justifying tendency of an institution which in over 30 years has itself never engaged in the kind of much needed systematic empirical effort to determine the dynamics of an election campaign or the type of conduct which actually has a coercive impact. The public interest 'need for such an empirical investigation into the assumptions underlying the Board's regulation of campaign tactics has for some time been recognized by labor law scholars.

*Getman v. NLRB*, 450 F.2d 670, 675–76 (D.C.Cir.1971) (footnotes omitted).

The majority finds support for the imposition of the bargaining order in *Electrical Products Division of Midland-Ross v. NLRB*, 617 F.2d 977 (3d Cir. 1980). I believe *Midland-Ross* involved a much different factual context and is easily distinguished from this case. In *Midland-Ross* the Company announced to all employees only two days before the election that it was closing one of its plants because of unprofitability. The Company then stated its belief that unionization leads to lower profitability. The clear implication of the Company's statement was that a Union victory could mean an eventual plant shutdown. The shutdown of the other plant lent credence to management threats. In this case there was no other plant shutdown. Unlike the record in *Midland-Ross, supra, id.* at 987, there is no evidence whatsoever that Hedstrom's workers presently fear any closedown because of unionization.

The crucial facts of this case bear considerable similarity to those in *Rapid Manufacturing Co. v. NLRB*, 612 F.2d 144 (3d Cir. 1979). In *Rapid Manufacturing* the Board imposed a bargaining order on a company which had committed two unfair labor practices during an election campaign. This court denied enforcement, stating:

As we have previously observed, by no means can we regard two unfair labor practices, such as these, committed during the course of a two month election campaign, as being "pervasive." Nor does the evidence reveal that this was an "extraordinary" case by any standard.

612 F.2d at 149. Similarly, in this case, the Board relied on several unfair labor prac-

tices which, by no stretch of the imagination, can be labeled "pervasive."

In the instant case, the Board again has mechanistically imposed a bargaining order, the effect of which is to mandate upon non-consenting employees[5] a labor organization as the exclusive bargaining agent. Such a draconian remedy should be justified by something more substantial than the traditional deference to the Board's claim of expertise in determining whether campaign tactics are likely to interfere with an employee's freedom of choice. This claimed expertise of the Board, however, is more mythical than real and has caused labor scholars to question the ability of the Board to determine what actually influences the voters' decision. See Getman and Goldberg, *The Myth of Labor Board Expertise*, 39 U.Chi.L.Rev. 681 (1972); Samoff, *NLRB Elections: Uncertainty and Certainty*, 117 U.Pa.L.Rev. 228 (1968).

The Board itself has based its findings concerning the impact of various campaign tactics largely on its own speculation and has never conducted an empirical study to determine the impact of various campaign techniques on voting behavior. Recently, however, some empirical research has been conducted. The preliminary results of this research indicate that campaigns have little impact on voting behavior and that the impact they may have is often just the opposite of that which the Board has assumed they would have.

*Harlan # 4 Coal Co. v. NLRB*, 490 F.2d 117, 123 n.5 (6th Cir.), *cert. denied* 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed. 763 (1974).

I therefore conclude that the Board's bargaining order lacks the support of substantial evidence and is a misapplication of *Gissel*. I would not enforce it. I would also deny enforcement of the Board's order as to all other unfair labor practice violations except for an order reinstating Ritchey with back pay. As to her, I would affirm the Board's order.

WEIS and GARTH, Circuit Judges, join in this dissent.

---

5. The number of employees in the bargaining unit in the first election was 249. *Hedstrom Co. v. NLRB*, 558 F.2d at 1141 n.6. At the time of the hearing in these proceedings, there were 312 employees in the bargaining unit, each of whom would be directly affected by the bargaining order.

The majority suggests that the Board need not consider the impact of employee turnover because to do so would "put a premium upon continued litigation by the employer." Maj. op. at 312 *quoting NLRB v. L. B. Foster Co.*, 418 F.2d 1 (9th Cir. 1969). Whatever justification this rationale may have in cases such as *L. B. Foster*, where the delay is solely the result of proceedings before the Board, is lacking in cases such as this where a major cause of delay was an error by the Board which necessitated a remand by the court of appeals. Requiring the Board to consider subsequent events in cases such as this not only promotes fairness to the employees but places a "premium" upon correct original decisions by the Board; it therefore does not unjustly reward an employer's protraction of the administrative proceedings. In fact, *Chromalloy Mining and Minerals, Etc. v. NLRB*, 620 F.2d 1120 (5th Cir. 1980), which is heavily relied upon by the majority, *see* Maj. op. at 312, 312 n.8, recognizes that the Board should consider subsequent events, such as employee turnover, after a case has been remanded to it by the court of appeals. *Chromalloy*, at 1131 *citing NLRB v. American Cable Systems*, 427 F.2d 446 (5th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970); *see "After All, Tomorrow is Another Day": Should Subsequent Events Affect the Validity of Bargaining Orders?*, 31 Stan.L.Rev. 505 (1979). Thus, since a major cause of the delay in this case was the Board's own failure to meet our *Armcor* standards, *see Hedstrom I, supra*, we should not condone the Board's failure to examine the impact of events which transpired during the course of that delay.