**RAPID MANUFACTURING COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1124.

United States Court of Appeals, Third Circuit.

Argued Nov. 15, 1979.

Decided Dec. 27, 1979.

John A. Craner (argued), Craner & Nelson, P.A., Mountainside, N. J., for petitioner.

Frederick Havard (argued), N. L. R. B., Washington, D. C., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., for respondent.

Before HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This case arises in a familiar factual pattern. After losing a representation election at petitioner's plant, the Union filed charges that the petitioner, Rapid Manufacturing, had committed unfair labor practices during the course of the election campaign, in violation of the National Labor Relations Act. The National Labor Relations Board sustained these charges in part. On the basis of the unfair labor practices which it found, the Board set aside the election and ordered Rapid to bargain with the Union. Conceding that substantial evidence supported the unfair labor practices which were found against it, Rapid only petitions us to review and set aside the bargaining order. The Board has cross-petitioned for enforcement.

We grant Rapid's petition to set aside the bargaining order. Although we recognize that the selection of remedies to enforce the

labor laws is a matter within the special competence of the Board, in this case we find virtually no evidence, let alone substantial evidence, that Rapid's unfair labor practices created a serious impediment to the electoral process. Accordingly, mindful that employee free choice is a cornerstone of the National Labor Relations Act, we refuse to sanction a "remedy" which was ordered without a basis in evidence and which effectively disenfranchises Rapid's employees.

## I.

### A.

Rapid operates a small manufacturing plant in New Jersey. The relevant bargaining unit, at the time these events occurred, numbered 45 persons. On or about September 20, 1976, Local 312 of the International Ladies' Garment Workers Union began an organizational campaign at the plant. On September 24, after it had obtained authorization cards from 25 employees, the Union requested Rapid to recognize it as the employees' exclusive bargaining agent. When the company refused recognition, the Union commenced the procedures which led to a Board certified election on November 12, 1976. The Union lost the election 16 to 20. Thereafter, the unfair labor practice charges were filed.

The Union's unfair labor practice charges were tried by an Administrative Law Judge. The Law Judge found that the company had violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1976),[1] through the conduct of two of its agents, Edith Ficeto and William Cruz, neither of whom were company officials. The Board affirmed these findings and issued the bargaining order recommended by the Administrative Law Judge.[2]

### B.

Edith Ficeto is no more than an employee in the plant in a non-supervisory capacity. She holds no office, is not a director and owns no stock. Nevertheless, because of her family ties with the management of the company, the Law Judge found her to be an agent of the company.[3] Both the Law Judge and the Board concluded that two instances of Ficeto's conduct constituted unfair labor practices.

The first unlawful incident concerned a conversation which Ficeto had outside the plant with an acknowledged union supporter, Ms. Bruno. While the record is unclear as to the exact date when this conversation took place, it is undisputed it occurred prior to September 24 when the Union obtained its card majority. Although four other employees were present at the time of the conversation, there is no evidence that all four of them understood what was being said. Nor is there evidence that the substance of the conversation was ever explained to them.[4] The Law Judge summarized his findings, in regard to this conversation, as follows:

1. This section provides:
   Sec. 8. (a) It shall be an unfair labor practice for an employer—
     (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

2. The Administrative Law Judge found that only one of the unfair labor practices necessitated a bargaining order (Ficeto's conversation with Bruno), and his order was based solely on that single violation. The Board, however, based the bargaining order upon all of the unfair labor practices found by the Administrative Law Judge.

3. One of Ficeto's brothers is a co-owner of the plant. Another brother is a supervisor. We are extremely dubious that the evidence supports this finding of agency. Nevertheless, the company has conceded that substantial evidence supported findings of unfair labor practices which are predicated upon this fact. Our failure to deal with the issue of agency in no way suggests that an employee who is related to a company official is, without more, an agent of that company so that she may be precluded from expressing her views on unionization during the course of an election campaign.

4. It is significant to note that Ficeto speaks only English and no Spanish, whereas the vast majority of the employees speak only Spanish and no English.

Ficeto told Ms. Bruno that Gualtier had instructed her to find out if Ms. Bruno had anything to do with the organizers being in front of the plant because Ms. Bruno had been seen speaking to them. Ms. Bruno said no. Ms. Ficeto then asked Ms. Bruno to ask Ms. Santiago the same question. Ms. Santiago said no. Ms. Ficeto asked Ms. Bruno what she was going to do about the Union. Ms. Bruno said she would not talk to anyone in the street. Ms. Ficeto asked what Ms. Bruno had to gain if a union came into the plant since it only meant that the union would get some money out of her paycheck every month. Besides, Ms. Ficeto said, the owners would just close the plant or move it someplace else.

App. at 167a–168a.

The second incident involving Ficeto occurred shortly before the election. Ficeto, while speaking with Maridel Roman, another employee, suggested that she, Ficeto, had an "idea" which employees would vote for the union. She also indicated that her brother would not stand idly by and would resist unionization. Finally, Ficeto told Roman that if there was a union, the work rules would have to be rigidly enforced and that therefore the employees should think twice before voting for the union. The Law Judge found that Roman had relayed Ficeto's advice to "think it over" to other employees. But there is no evidence that the substance of the conversation was in fact related by Roman to anyone else.

### C.

William Cruz is the second person whose conduct was attributed to the company and whose actions were found to constitute an unfair labor practice. Like Ficeto, Cruz was not a company official. In fact, Cruz was not even a Rapid employee. Cruz worked for the life insurance agent which serviced Rapid's employee insurance plan. Although he was not primarily in charge of Rapid's account, because he was bilingual, Cruz frequently visited the plant and helped service Rapid's account. Because of this relationship, Cruz was found to be an agent of Rapid.

Cruz' actions giving rise to an unfair labor practice were as follows: Due to a problem with Rapid's clerical staff, several of Rapid's newly hired employees had not been processed for insurance benefits in a timely fashion. These employees were finally processed by Cruz in interviews held shortly before the union election.[5] The untimely registration for insurance benefits was found to be an unfair labor practice. In addition, the Law Judge found that Cruz made anti-union comments when he interviewed two pro-union employees. These comments were also held to constitute unfair labor practices.

### D.

The Board affirmed the unfair labor practices found by the Administrative Law Judge. In addition, the Board found that these unfair labor practices were so serious and had created such an indelible impression that a fair rerun election would be virtually impossible. In reaching this conclusion, the Board specifically noted that the presence of Ficeto and of the plant owners would be a "constant reminder to the employees of the antiunion sentiments" and past violations. Furthermore, the Board pointed out that Rapid had failed to repudiate Ficeto's and Cruz' anti-union statements. Consequently, based upon these factors the Board concluded that the unfair labor practices would have a lingering impact. It therefore issued a bargaining order.

In this court, Rapid objects only to the issuance of the bargaining order, not to the unfair labor practices which were found. We agree with Rapid that a bargaining order was unjustified in this case.

---

**5.** The interviews were on November 9; the election was on November 12. Rapid's president was at first skeptical of holding these interviews just prior to the election. In fact, as the Law Judge found, they were conducted only after Rapid's president had consulted with counsel.

**148**

## II.

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613–16, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court developed a tripartite scheme for the imposition of bargaining orders. First, in "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices, the Board may issue a bargaining order even if the union has not made a showing of a card majority. Second, bargaining orders may be issued "in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process." Finally, there is a third category of cases with "minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order." *See also Frito-Lay v. NLRB*, 585 F.2d 62 (3d Cir. 1978).

### A.

There has been little definition given to the terms "outrageous" and "pervasive" which are the standards to be met in a *Gissel I* "exceptional" case. In this case the Board ruled that a bargaining order should be issued by reason of the three unfair labor practices which it found. As earlier noted, two of these incidents involved Ficeto conversations, the third involved Cruz' insurance interviews. Of these three, Ficeto's conversation with Bruno must be classified as the most serious.

Here the Board concluded that it need not decide whether this was an "exceptional" case within the first *Gissel* category since the Union had a card majority.[6] App. at 163a n. 23. But in reaching this conclusion the Board failed to recognize that Ficeto's conversation with Bruno, which was probably her most serious transgression, occurred *before* the Union had obtained a card majority. The record indicates that all of the authorization cards were signed *after* this conversation oc-

curred. *See* App. 18a–31a. As a consequence, it is impossible to argue that this conversation "undermine[d] majority strength" which is an essential requirement of the second *Gissel* category. *Cf. Struthers-Dunn v. NLRB*, 574 F.2d 796 (3d Cir. 1978) (bargaining order not enforced when union majority had dissipated before commencement of unfair labor practices). While we recognize that theoretically, evidence which does not support a *Gissel II* bargaining order may, nonetheless, if deemed "outrageous" and "pervasive," provide a basis for a *Gissel I* order—Ficeto's conversation with Bruno, when considered with the other unfair labor practices, no matter how viewed, falls far short of meeting *Gissel I* requirements. The three unfair labor practices can hardly be classed as "pervasive" in relation to a two month organizational campaign. Moreover, when consideration is given to the circumstances under which they were committed, we cannot say that the practices found by the Board are "outrageous," particularly since neither company officials nor large numbers of employees nor immediate drastic consequences were involved. Whatever may be intended by, and included within, the terms "outrageous" and "pervasive," we are satisfied that those standards have not been met here, and hence, such characterizations are not applicable. In sum, this is not an "exceptional" case within the first *Gissel* category.

### B.

Having concluded that the evidence will not support a *Gissel I* order and that the pre-majority Ficeto conversation cannot sustain a *Gissel II* order, we must still consider whether the remaining unlawful conduct—Ficeto's conversation with Roman and Cruz' actions, both of which occurred post majority—can justify a bargaining order under the relaxed standards of the

---

**6.** Rapid attacks the Board's conclusion that the Union had a card majority by arguing that the authorization cards were not properly authenticated so as to be admissible into evidence. In

light of our disposition of this case—finding a bargaining order unwarranted even if the union had a card majority—we need not reach this issue and therefore we decline to do so.

second *Gissel* category. As we have been instructed, a *Gissel II* order may be imposed "in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes," 395 U.S. at 614, 89 S.Ct. at 1940. Despite the Supreme Court's approval of a bargaining order under such circumstances, the court in *Gissel* nevertheless still emphasized and expressed a clear preference that elections be held whenever possible. The Supreme Court would sanction *Gissel II* bargaining orders only

> If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue.

395 U.S. at 614–15, 89 S.Ct. at 1940. Having made our own examination of the record, we conclude that the evidence in this case is not sufficiently substantial to sustain the Board's findings in support of a *Gissel II* order.

To enforce the Board's order in this case would require us to find that the record contained some evidence that Ficeto's conversation with Roman, and Cruz' insurance interviews, had at least some "pervasive" effect, were to some degree "extraordinary," and had the "tendency to undermine majority strength and impede the election processes." *Id.* at 614, 89 S.Ct. 1940. There is no such evidence.

As we have previously observed, by no means can we regard two unfair labor practices such as these, committed during the course of a two month election campaign, as being "pervasive." Nor does the evidence reveal that this was an "extraordinary" case by any standard. Most significant in this regard is the fact that the unlawful actions of Ficeto and Cruz could have af-

fected only a very few employees and therefore, could have had only a limited impact on the labor force. The seriousness of Ficeto's improper remarks to Roman is substantially diminished by the fact that her remarks were only communicated to one employee—Roman. The other employees who were standing nearby could not speak English and therefore could not have understood what Ficeto had said.[7] Similarly, Cruz' activities only affected a small segment of the employee group. By contrast, in almost every other case where bargaining orders have been enforced, the unfair labor practices had some demonstrable impact on a significant percentage of the employees in the bargaining unit. *See, e. g., NLRB v. Daybreak Lodge Nursing & Convalescent Home, Inc.,* 585 F.2d 79 (3d Cir. 1978) (specific finding that threats were disseminated throughout the bargaining unit); *Frito-Lay v. NLRB,* 585 F.2d 62 (3d Cir. 1978) (unilateral increase in benefits; numerous threats); *Kenworth Trucks of Philadelphia v. NLRB,* 580 F.2d 55 (3d Cir. 1978) (unilateral increase in benefits); *NLRB v. Colonial Knitting,* 464 F.2d 949 (3d Cir. 1972) (3 out of 5 employees in the bargaining unit received wage increases).

Also undercutting any finding that these two unfair labor practices were, by any test, even minimally entitled to be labeled "extraordinary," in terms of their proclivity to undermine the election process, is the fact that no senior company official was found to have committed, or to have sanctioned any unlawful labor activity. Threats by senior company officials may naturally be assumed to have a stronger impact upon the employees in the bargaining unit than "threats" made by a fellow employee or by an insurance advisor. It is not without significance that the cases in which this court has enforced bargaining orders based on threats, have almost always involved unlawful activity by senior company officials. *See, e. g., NLRB v. Daybreak Lodge Nursing & Convalescent Home, Inc., supra; NLRB v. Easton Packing Co.,* 437 F.2d 811

---

**7.** The Administrative Law Judge found that Roman had conveyed Ficeto's advice to "think it over" to the others. He made no finding and

we find no evidence that the more threatening portions of Ficeto's remarks were communicated to anyone but Roman.

(3d Cir. 1971). As noted, not only were Rapid's senior officials not involved with any unlawful activities, but the evidence is unequivocal that the unfair labor practices were committed by individuals who were not even part of Rapid's management team.[8] Thus, the evidence of Ficeto's and Cruz' abilities to undermine majority strength and to impede the election process in a long lasting fashion, is not only extremely questionable but, in our opinion, almost nonexistent.

Finally, the factors isolated by the Board to show the continuing impact of the unfair labor practices, see p. 147 supra, are not rooted in evidence sufficiently substantial to demonstrate that "the possibility . . . of ensuring a fair election (or a fair rerun) . . . is slight." Gissel, 395 U.S. at 614, 89 S.Ct. at 1940. The fact that Ficeto and the owners of the plant will be present during a second organizational campaign either proves too little or too much. Since the record lacks substantial evidence that Ficeto's activities significantly undermined the election process in the first campaign, it certainly cannot support the conclusion that Ficeto's presence would preclude a fair second election. Moreover, insofar as the plant owners are concerned, they were not found to have committed any unfair labor practices in the first election; thus it is patently unreasonable to assume that their presence in the plant would infect the "laboratory conditions" of a second election campaign. See General Shoe Corp., 77 N.L.R.B. 124, 127 (1948).

Furthermore, the Board's suggestion that the mere presence of Ficeto and the plant owners during a second organizational campaign would preclude a fair rerun election, certainly goes too far. If indeed the mere presence of plant owners precludes a fair election, then a bargaining order might be imposed in every case where the owner of a small plant commits an unfair labor practice, or where a company official who commits an unfair labor practice is not fired for his indiscretion, all without regard to Gissel standards. No court to our knowledge has yet to sustain such a sweeping power in the Board. To the contrary, in discussing bargaining orders, the Supreme Court took great pains to limit the Board's remedies to other than bargaining orders when the unfair labor practices, found by the Board, were "minor or less extensive" and had "minimal impact on the election machinery." Gissel, 395 U.S. at 615, 89 S.Ct. at 1940. If it were otherwise, the large scale disenfranchisement which would flow from the indiscriminate and ready imposition of bargaining orders would be in express contradiction to the preference for elections which inheres in our labor law. See Gissel, 395 U.S. at 603–04, 89 S.Ct. 1918.[9]

### III.

In summary, we conclude that the record lacks substantial evidence that the unfair labor practices in this case were serious enough, or pervasive enough, to "have the tendency to undermine majority strength and impede the election process." Gissel, 395 U.S. at 614, 89 S.Ct. at 1940. Neither is there substantial evidence that the possibility "of ensuring a fair election . . . is slight." Id. Accordingly, under the standards articulated by the Supreme Court, we will not enforce the bargaining order issued by the Board in this case.

In reaching this conclusion, we are not unmindful of the Supreme Court's admonition that "[i]t is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair

---

8. Ficeto, in fact, was a member of the employee bargaining unit.

9. The Board also cited the company's failure to publicly rebuke Ficeto and Cruz as grounds for a bargaining order. Certainly any continuing impact which this failure may have could be corrected by a cease and desist order and posting of notices. Hence, even assuming that Rapid had the power to restrict, rebuke, or discipline Ficeto, who was no more than employee, see note 3 supra, and Cruz, who was not even an employee, any default by the company in reproving Ficeto and Cruz cannot constitute substantial evidence that a fair rerun election would not be possible.

labor practices of varying intensity," since "the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *Gissel,* 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32.[10]

Nevertheless, we do not think that the Court intended the Board to dispense casually with the election process which is by far the superior and preferred means of determining employee sentiment. Here we are not substituting our judgment for that of the Board. *See Consolo v. Federal Maritime Commission,* 383 U.S. 607, 621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Rather we are adhering to the mandate that "[r]eviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). We would be remiss in our judicial functions if, on a record as sparse as this one, we were to enforce a bargaining order which, on every count, cannot even be regarded as colorably in compliance with *Gissel.*

Accordingly to the extent that the Board's order of November 28, 1978 imposes bargaining requirements on Rapid, it will be vacated. Those portions of the Board's order not challenged by Rapid will be enforced.

## IV.

Consistent with our opinion, we will grant Rapid's petition for review, limited however, to setting aside so much of the Board's order as requires bargaining. To the same extent, we will deny the Board's cross-petition for enforcement of its bargaining order. The case will be remanded to the Board for proceedings not inconsistent with this opinion.

Costs will be taxed in favor of the petitioner, Rapid.

---

10. The Board's "expertise" in this area has recently been called into question. *See* J. Get-

man, S. Goldberg, J. Herman, Representation Elections: Law and Reality (1976).