**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**EASTERN STEEL COMPANY, Respondent.**

**No. 81–1704.**

United States Court of Appeals, Third Circuit.

Argued Dec. 14, 1981.

Decided Feb. 19, 1982.

As Amended March 3, 1982.

---

Allison W. Brown, Jr., James D. Donathen (argued), William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Michael F. Kraemer (argued), William J. Payne, Kleinbard, Bell & Brecker, Philadelphia, Pa., for respondent.

Before ADAMS, GIBBONS and GARTH, Circuit Judges.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

GIBBONS, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order directing Eastern Steel Company (Eastern) to cease and desist from several unfair labor practices, to reinstate two employees, and to bargain collectively with the Highway

Truck Drivers and Helpers Union No. 107 (Union).[1] We enforce.

## I

Eastern conducts a steel processing, warehousing and selling business at Wyndmoor, Pennsylvania. Its management consists of its owner and president, Edward J. Mammana and an employee found by the Board to be a supervisor, A. Robin Loughran. Eastern employs in its warehouse a full-time truck driver, a full-time machinist-warehouseman, and two regular part-time machinists-warehousemen, one of whom, Edward Mammana, is the president's son. In June of 1979, James Fogerty, the truck driver employee, obtained from a union organizer union authorization cards which were distributed to the bargaining unit employees other than the owner's son. Signed cards for the three were turned over to the Union on June 6, and on June 8 it sent a letter to Eastern claiming to represent more than fifty percent of the employees in the warehousemen, drivers and machine operator classifications. When Eastern declined to recognize it as a bargaining representative, the Union, on June 11, 1979 filed a petition for a representation election with the Board's regional office. The unfair labor practices which are the subject of the administrative proceedings involve Eastern's reactions to the bargaining demand and the representation petition.

The Board charged that Eastern violated Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., by threatening employees with loss of benefits if they selected the Union as their bargaining representative, by forbidding discussions about the Union, and by interrogating employees about Union activities. It charged Eastern with violating Sections 8(a)(3) and (1) of the Act by discharging two employees for union activity. The complaint alleged, and Eastern denied, that A. Robin Loughran is a supervisor within the meaning of the Act. Substantial evidence in the record supports the finding of the Administrative Law Judge that Loughran is a supervisor.

■ The ALJ also found: that upon receipt of the bargaining demand president and owner Mammana asked Loughran to inquire of the truck driver, Fogerty, whether he had signed a union card; that Loughran interrogated Fogerty about signing a card; that later Loughran interrogated the full-time warehouse employee McClellan; that both denied signing cards; that Mammana interrogated part-time employee Johnson about whether anyone from the Board had come around, and about signing a card; that Johnson also denied signing; that Mammana later met with three of the four bargaining unit employees, including his son, interrogated them about signing cards and when each denied signing, charged that "somebody was lying, because he knew the cards were filled out;" that in the conversation with the three employees Mammana charged Fogerty, who was absent, with being responsible for starting the union activity and that he was a "no good bum" and a lazy worker. The Administrative Law Judge also found that Mammana expressed hostility to unions by observing that people who join unions "usually are low-life, or they can't make a go out of life"; threatened, if a union came into the warehouse, that "the place wouldn't be as lax as it is", that they would no longer receive a Christmas bonus or be covered by Eastern with Blue Cross or Blue Shield, and that Eastern would not be responsible for anyone's pension; threatened further that the practice of assigning employees to whatever work was available would cease if the employees unionized and that they would work fewer hours. The Administrative Law Judge also found that at the close of his meeting with the employees, Mammana instructed those who were present not to talk about the Union until after the representation election. The foregoing findings are supported by substantial evidence and amply justify the Board's legal conclusions that Eastern, in violation of Section 8(a)(1) of the Act coercively interrogated employees about, threatened them

---

1. The Board's Decision and Order are reported at 253 NLRB No. 163.

with retaliation for and restrained them from engaging in protected activity.

The Administrative Law Judge also found that, about a week after his meeting with the employees, Mammana discharged Union adherents McClellan and Loughran and laid off Union adherent Johnson; that both were discharged because Eastern knew or suspected that they had signed union authorization cards; that their discharge would destroy the Union's majority in the bargaining unit; that thereafter a temporary employee was hired; and that an offer to McClellan to rehire him as a supervisor, which would take him out of the bargaining unit and justify his discharge if he later engaged in union activities, was made after McClellan filed an unfair labor practice charge with the Board, for the purpose of limiting Eastern's backpay liability. These findings of fact are also supported by substantial evidence and support the Board's conclusion that Eastern violated Section 8(a)(1) and (3) of the Act by discharging McClellan and Johnson.

The foregoing findings of fact and conclusions of law justify the Board's order that Eastern cease and desist from the interrogations, restraints and threats and that McClellan and Johnson be offered reinstatement with back pay.

## II

The Administrative Law Judge also found that, when it demanded recognition on June 11, 1979, the Union had valid union authorization cards from three members of a bargaining unit which consisted of those three plus the owner's son, and that thereafter Eastern refused to bargain collectively. She concluded that in the circumstances of this case a bargaining order was an appropriate remedy, and the Board agreed. Eastern objects to the enforcement of that order, alleging that the Board's findings of fact do not justify an order and that the Board failed to articulate reasons for issuance.

It is settled by our decision in *NLRB v. Permanent Label Corporation*, 657 F.2d 512 (3d Cir. 1981) (en banc), that the Board may

satisfy the statement of reasons requirement of *Hedstrom Co. v. NLRB*, 629 F.2d 305 (3d Cir. 1980) (en banc), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981), by adopting the findings of the Administrative Law Judge who conducted the hearing. The Board followed that practice in this case, and thus we turn to those findings.

In explaining why a bargaining order remedy was appropriate, the Administrative Law Judge first observed that this was a case in which the Union started with a card majority.

In short, before Respondent began its violations of Section 8(a)(1) and (3) of the Act, all of the employees in the unit had executed operative cards designating the Union as its collective-bargaining representative. Under such circumstances, a bargaining order should issue not only in the "exceptional" case of "outrageous" and "pervasive" unfair labor practices which are of "such a nature that their coercive effect cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be held," but also in "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process." [*NLRB v.*] *Gissel* [*Packing Co.*], *supra*, 395 U.S. [575,] at 613–614 [89 S.Ct. 1918, 1939–1940, 23 L.Ed.2d 547].

(App. 266). Having found that a card majority existed, she then considered why a representation election was not a sufficient protection for the employees' choice of a bargaining representative.

In view of Respondent's action in destroying the bargaining unit by discriminatorily discharging all but one of the employees in the unit, I conclude that the instant case calls for, at the very least, a "second-category" bargaining order. Whether in such a "second category" case the refusal to bargain constitutes a Section 8(a)(5) violation and calls for a bargaining order turns on whether the possibility of erasing the effects of past unfair

labor practices and insuring a fair election by the use of traditional remedies is slight and employee sentiment would, on balance, be better protected by a bargaining order. Among the factors material in making such an assessment are the extensiveness of the employer's unfair labor practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. *Gissel, supra,* 395 U.S. at 614–615 [89 S.Ct. at 1940]; *Daybreak Lodge Nursing & Convalescent Home,* 230 NLRB 800, 804–805 (1977), enfc., 585 F.2d 79 (C.A. 3, 1978); *Frito-Lay, [Inc. v. NLRB], supra,* 585 F.2d [62,] at 68–69 [ (3d Cir. 1978) ].

On the basis of these standards, I agree with the General Counsel that a bargaining order should issue here. As previously noted, the June 1979 discharges rendered an immediate election impossible, because they reduced the unit to only one employee; and no more were hired until January 1980. Furthermore, "The discharge of employees because of union activity is one of the most flagrant means by which an employer can hope to dissuade employees from selecting a bargaining representative because no event can have more crippling consequences to the exercise of Section 7 rights than the loss of work." *Ethan Allen, Inc.,* 247 NLRB No. 90 (1980); see also, *Atlanta Blue Prints & Graphics Co.,* 244 NLRB No. 105 (ALJD Part II, p. 12) (1979). "Moreover, in a small unit, the impact of such discharges has a far greater effect than in a larger one and practically makes a fair election impossible." *Pay 'N Save, supra,* 247 NLRB No. 184. In addition, Respondent coercively interrogated all the unit employees about union activities, unlawfully forbade employees even to discuss the Union until after the election, and threatened to punish all of them, if the Union came into the shop, by withdrawing Christmas bonuses, insurance benefits, and a pension plan, and by being less "lax" than at present. All the discharges and threats, and most of the interrogation, proceeded from Respondent's president and sole stockholder, who

is the active head of the business. Furthermore, so far as the record shows, the only conduct by Respondent even arguably constituting an effort to neutralize these unfair labor practices was its offer to McClellan of a job which, although it paid the same as his old job, was more difficult, removed him from the bargaining unit, and exposed him to lawful discharge for subsequent union activity. In view of the top-level source of Respondent's unfair labor practices and the absence of any real effort to counteract them, I conclude that the mere issuance of a cease-and-desist, reinstatement/backpay, and notice-posting order will likely be insufficient to deter Respondent from future unfair labor practices which would impede a fair election. (Footnotes omitted).

(App. 266–67). Thus the stated reasons refer to (1) the reduction of the bargaining unit to one employee; (2) the discharge of employees to dissuade employees from selecting a bargaining representative—a most flagrant means of dissuasion; (3) the effect of such discharge in so small a unit; (4) the coercive interrogation of every unit employee; (5) the forbidding of employees from discussing the union until after the election; (6) the threats of punishment if a union were chosen; (7) the high level of management from which the discharges, threats and interrogation emanated; (8) the fact that the President was also the sole stockholder; and (9) the fact that even after a charge was pending Mammana attempted to remove McClellan from the bargaining unit by offering him a job as a supervisor.

These nine reasons are legally sufficient to justify issuance of a bargaining order where the Union started with a card majority. To those reasons we can add another. When the employer's workforce consists of four persons, one of whom is the son of the president, and the other three sign valid union authorization cards, the degree to which employees' free choice of a bargaining representative will be enhanced by a Board supervised secret ballot election is undiscernible. In such circumstances the

*only* thing accomplished by delaying collective bargaining for an election is to provide an opportunity for the unfair labor practices to affect the behavior of one or more eligible voters.

█  As to Eastern's objection to the manner in which the Administrative Law Judge expressed the need for a bargaining order, we can only reiterate what was said in *Permanent Label.*

> We do not believe enforcement should be denied merely because the ALJ did not write down the inescapable inference he made in recommending that a bargaining order issue—that merely ordering the Company to refrain from future violations would not erase the effects of those threats and other egregious violations from the employees' memories, and thus that the possibility of a fair rerun election was slight.

657 F.2d at 521. A remand for a clearer statement of reasons here would accomplish only two things. It would postpone, perhaps for eighteen months, the issuance of an order directing Eastern to bargain collectively with the Union, and it would perhaps teach the Administrative Law Judge a lesson in grammar. We are not, however, running a clinic in legal writing. Her reasoning process is sufficiently discernible for our review.

The Board's order of January 9, 1981 will be enforced in full.

ADAMS, Circuit Judge, concurring.

I join the result reached by Judge Gibbons because I believe: (1) that there is substantial evidence on the record to support the Board's finding of unfair labor practices on the part of the company; (2) that under the circumstances present here the Board did not commit legal error or abuse its discretion in imposing a bargaining order; and (3) that the Board, by incorporating the decision of the Administrative Law Judge, satisfied this Court's requirement that the justification for a bargaining order be sufficiently articulated to permit meaningful appellate review. In view of Judge Garth's dissent, however, I write separately to address the continuing uncertainty that appears to exist in this Court regarding the findings that are necessary to support a bargaining order.

In *NLRB v. Gissel Packing Co., Inc.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court concluded that the National Labor Relations Board was authorized to impose a bargaining order not only in exceptional circumstances involving "outrageous" anti-union practices on the part of an employer, but also in situations "marked by less pervasive practices which nonetheless still have the tendency to undermine [a union's previously-demonstrated] majority strength and impede the election processes." *Id.* at 614. In a unanimous opinion by Chief Justice Warren, the Court indicated that such an order was appropriate when "the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." *Id.* at 614–15, 89 S.Ct. at 1940. Most particularly, considering the difference that divides our Court today, the Justices cautioned against excessive judicial second-guessing of administrative decision-making in this area: because "the Board draws on a fund of knowledge and expertise all its own," its choice of remedy was to be given "special respect" by reviewing courts. *Id.* at 612 n.32, 89 S.Ct. at 1939 n.32. The *Gissel* opinion was silent, however, in regard to precisely what degree of unfair labor activity was sufficient to justify issuance of a bargaining order, whether the Board itself was obligated to make findings in this connection independent of the ALJ, or with what exactitude any conclusion that a bargaining order was necessary had to be documented and supported.

In the aftermath of *Gissel,* bargaining orders issued by the NLRB ordinarily were given effect by the various appellate

courts.[1] It is "no secret," *NLRB v. K & K Gourmet Meats, Inc.*, 640 F.2d 460, 470 (3d Cir. 1981) (Gibbons, J., dissenting), however, that at least in this Circuit,[2] in the past several years the Board has enjoyed only mixed success in its efforts to enforce *Gissel* orders as remedies for unfair labor practices.[3] The checkered pattern formed by our recent cases can be attributed to three general judicial concerns. First, the Court has insisted that the record contain a sufficient "basis in fact" to support a finding by the Board that a bargaining order is appropriate. *See, e.g., K & K Gourmet Meats, supra,* 640 F.2d at 467–70; *Rapid Manufacturing Co. v. NLRB,* 612 F.2d 144, 148–51 (3d Cir. 1979). Second, the Court has concluded, although only after a considerable controversy, that the Board is free to adopt verbatim the findings and reasoning of an ALJ without stating separately and independently its own reasons for imposing a bargaining order. *See NLRB v. Permanent Label Corp.,* 657 F.2d 512, 519 (3d Cir. 1981) (in banc); *Kenworth Trucks of Philadelphia, Inc. v. NLRB,* 580 F.2d 55, 61–63 (3d Cir. 1978). Finally, the Court has indicated that either the ALJ or the Board must "articulate [those] factors that justify the choice of this remedy over the ordering of a new election." *See Permanent Label, supra,* 657 F.2d at 519. It is this third concern that is implicated in the present proceeding.

Our request that the NLRB "provide a statement of reasons leading to the imposition of a bargaining order," *id.* at 521, can be traced to *NLRB v. Armcor Industries,* *Inc.,* 535 F.2d 239 (3d Cir. 1976). In that decision, the Court first announced that *Gissel* orders imposed by the Board would not be enforced absent " ' "specific findings" as to the immediate and residual impact of the unfair labor practices on the election process . . . [and] "a detailed analysis" assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring misconduct, and the potential effectiveness of ordinary remedies.' " *Id.* at 244 (quoting *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1118 (7th Cir. 1973)). The Court's stated reasons for mandating that the Board justify its order in such a fashion were threefold: an articulation requirement would "serve[ ] as a prophylaxis against an arbitrary exercise of the Board's power" (quoting *Walgreen Co. v. NLRB,* 509 F.2d 1014, 1018 (7th Cir. 1975)), facilitate the exercise of meaningful judicial review, and "contribute[ ] to the growth and predictability of this important area of labor law," *Armcor, supra,* 535 F.2d at 245. Imposing upon the Board an obligation to explain and defend any bargaining order it issued could not help but " 'guarantee the integrity of the administrative process,' " *id.* (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Board of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 2374–2375, 37 L.Ed.2d 350 (1973)).

Whatever the theoretical virtues of the articulation requirement enunciated in

1. *See* Comment, *Enforcement of Collective Bargaining Orders in the Third Circuit: The Rise and Fall of the Armcor Standards,* 25 Vill.L. Rev. 913, 917, 920–21 (1979–1980) (citing cases).

2. For recent developments in other Circuits, *see generally* Comment, *The* Gissel *Bargaining Order, the NLRB, and the Courts of Appeals: Should the Supreme Court Take a Second Look?,* 32 S.C.L.Rev. 399, 403–23 (1980).

3. *Compare NLRB v. Permanent Label Corp.,* 657 F.2d 512 (3d Cir. 1981) (in banc); *NLRB v. Garry Mfg. Co.,* 630 F.2d 934 (3d Cir. 1980); *Hedstrom Co. v. NLRB,* 629 F.2d 305 (3d Cir. 1980) (in banc), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981); *Electrical Prods. Div. of Midland-Ross Corp. v. NLRB,* 617 F.2d 977 (3d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980); *NLRB v. Daybreak Lodge Nursing and Convalescent Home, Inc.,* 585 F.2d 79 (3d Cir. 1978); *Kenworth Trucks of Philadelphia, Inc. v. NLRB,* 580 F.2d 55 (3d Cir. 1978); *Frito-Lay, Inc. v. NLRB,* 585 F.2d 62 (3d Cir. 1978); *and NLRB v. Eagle Material Handling, Inc.,* 558 F.2d 160 (3d Cir. 1977) (enforcing bargaining orders) *with NLRB v. K & K Gourmet Meats, Inc.,* 640 F.2d 460 (3d Cir. 1981); *Rapid Mfg. Co. v. NLRB,* 612 F.2d 144 (3d Cir. 1979); *NLRB v. Craw,* 565 F.2d 1267 (3d Cir. 1977); *Hedstrom Co. v. NLRB,* 558 F.2d 1137 (3d Cir. 1977); *and NLRB v. Armcor Indus., Inc.,* 535 F.2d 239 (3d Cir. 1976) (denying enforcement of bargaining orders).

*Armcor*,[4] in practice it has proved somewhat perplexing to determine precisely what sort of explication on the part of the Board is sufficient to survive judicial scrutiny. In the *Armcor* decision itself, for example, one member of the panel disagreed with the majority's conclusion that the Board had failed to justify adequately its resort to a bargaining order. *Armcor, supra*, 535 F.2d at 246 (Gibbons, J., dissenting). Nor is it easy to reconcile the arguably inconsistent results reached in four cases that immediately followed *Armcor*, two of which rejected the Board's findings as conclusory and inadequate, *see Hedstrom Co. v. NLRB*, 558 F.2d 1137 (3d Cir. 1977); *NLRB v. Craw*, 565 F.2d 1267 (3d Cir. 1977), and two of which enforced bargaining orders despite objections that the *Armcor* standards had not been satisfied, *see NLRB v. Daybreak Lodge Nursing and Convalescent Home, Inc.*, 585 F.2d 79 (3d Cir. 1978); *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160 (3d Cir. 1977). In a number of more recent instances, panels again have split with respect to whether the Board had convincingly demonstrated that more traditional remedies were inadequate to ameliorate whatever unfair labor practices had been identified. *See Electrical Products Division of Midland-Ross Corp. v. NLRB*, 617 F.2d 977 (3d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980); *NLRB v. Garry Manufacturing Co.*, 630 F.2d 934 (3d Cir. 1980). And, on no fewer than three occasions, this Court has elected to assemble in banc in order to consider various aspects of the articulation requirement for bargaining orders. *See Permanent Label, supra; Hedstrom Co. v. NLRB*, 629 F.2d 305 (3d Cir. 1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981); *NLRB v. Armcor Industries, Inc.*, No. 77–1495 (3d Cir. Nov. 15, 1978) (unreported per curiam; denying enforcement of a bargaining order by an equally divided vote). In my view, the case at bar amounts to yet another chapter in this Court's sisyphean struggle to give meaning to the articulation requirement imposed on the Board by *Armcor* without running afoul of the Supreme Court's instruction that the Board's "choice of remedy . . . be given special respect by reviewing courts," *Gissel, supra*, 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32.

Although there is much to commend in the analysis set forth by Judge Garth in his dissent in this case, I am persuaded that the opinion rendered by the ALJ and adopted by the Board constitutes *"minimally* sufficient compliance," *Eagle Material Handling, supra*, 558 F.2d at 167 n.11, with *Armcor* and its progeny. I arrive at this conclusion for a number of reasons. First, the ALJ's justification as to the need for a bargaining order was as comprehensive and persuasive as that approved in previous instances by our full Court, *compare, e.g., Permanent Label, supra*, 657 F.2d at 520–21; *Hedstrom, supra*, 629 F.2d at 310 n.4; *see also Kenworth Trucks, supra*, 580 F.2d at 62 n.4. Second, I believe that the proposition advanced in the dissent here, however meritorious it may be, cannot be reconciled with the explicit holding of the in banc Court only a few months ago that "it is sufficient for the ALJ to provide an extensive list of the factors giving rise to [a] recommendation that a bargaining order be issued." *Permanent Label, supra*, 657 F.2d at 521. In this case, as in *Permanent Label*, I believe that were we "to require that the ALJ also specifically state each inference drawn from these factors, no matter how obvious it is from the opinion, we would elevate form over substance and overstep the appropriate limits of judicial review of the Board's choice of remedy." *Id.* Third, in a previous in banc decision, we stressed that " 'an *elaborate* explanation of the factors giving rise to the conclusion that a bargaining order is needed is not essential,"

---

4. *Compare* Comment, *supra* note 1, at 926–28 (concluding that the Board should be required to make "specific findings" and provide a "reasoned analysis" when issuing *Gissel* orders) *with Permanent Label, supra*, 657 F.2d at 522–28 (Aldisert, J., concurring) (criticizing the *Armcor* rule for having been "promulgated without authority" and for the ease with which "panels of this court have manipulated it primarily to achieve the results a given panel majority desires").

*Hedstrom, supra,* 629 F.2d at 309 (quoting *Kenworth Trucks, supra,* 580 F.2d at 60 (emphasis added)) and that "[t]he requirement of a reasoned analysis . . . was meant neither to burden the Board nor to 'limit the issuance of bargaining orders whenever necessary,'" *Hedstrom, supra,* 629 F.2d at 309 (quoting *Armcor, supra,* 535 F.2d at 245). Absent further guidance from either the Supreme Court, our full Court, or the Congress,[5] it would not appear in order at this time either to retreat from these clear precepts or to hold that the Board is required, *as a matter of law,* to focus in depth upon each and every issue raised in the dissenting opinion. As I see it, the position urged in the dissent does not pay sufficient heed to the Supreme Court's explicit instruction that the Board's "choice of remedy" be given "special respect" by a reviewing court. *Gissel, supra,* 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32. *See also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 525, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978) (courts should not "engraft[ ] their own notions of proper procedures upon agencies entrusted with substantive functions by Congress"); *Kenworth Trucks, supra,* 580 F.2d 55, 61–63 (3d Cir. 1978) (Opinion on Rehearing) (reversing, in light of *Vermont Yankee,* an earlier determination that a bargaining order had not been adequately justified by the Board).[6]

For these reasons, therefore, I join in the Court's conclusion that the NLRB has sufficiently explained why a bargaining order is necessary to remedy the unfair labor practices committed by Eastern Steel.

GARTH, Circuit Judge, dissenting.

I agree that there is substantial evidence to affirm the Board's finding of unfair labor practices. I write separately to express my dissatisfaction and disagreement with an analysis that permits the Board to issue a bargaining order even though it has not in my opinion *"appraise[d]* those factors which might reasonably have a bearing on the likelihood of a fair rerun election." *Hedstrom Co. v. NLRB,* 629 F.2d 305 (3d Cir. 1980) (en banc) (Hedstrom II) (emphasis added).

In *NLRB v. Armcor Industries,* 535 F.2d 239 (3d Cir. 1976) and *Hedstrom Co. v. NLRB,* 629 F.2d 305 (3d Cir. 1980) (en banc), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981) this court held that when the Board imposes a bargaining order, it must articulate its reasoning and explain the factors that justify imposing this extraordinary remedy over the preferred remedy of ordering a new election. In *NLRB v. Permanent Label Corp.,* 657 F.2d 512 (3d Cir. 1981) (en banc) this court sitting *en banc* once again reviewed the Board's practice of imposing a bargaining order rather than ordering a election. This court while reaffirming our previously announced *Armcor-Hedstrom* standard, which as I have noted requires an "appraisal of all factors bearing on the likelihood of a fair rerun election," nevertheless, determined that the Board had met our standard. It did so by accepting as a sufficient articulation, conclusory statements of the Board, and a repetition of the Board's findings with respect to the Company's unfair labor practices.

---

**5.** In view of the controversy that has arisen not only in this Circuit but in several other Circuits as well with respect to various procedural and substantive issues involving the Board's imposition of bargaining orders, *see* Comment, *supra* note 2, it might be salutary for the Congress to consider adopting whatever legislation is necessary to clarify the law, restore uniformity among the Circuits, and reduce the prodigious amount of litigation that has been spawned in this area because of the lack of a definitive national rule.

**6.** The Supreme Court, albeit in a somewhat different context, recently reiterated that appellate courts were not to "substitute [their own] judgment[s] for those of the Board with respect to the issues that Congress intended the Board [to] resolve," lest "the role of the judiciary in administering regulatory statutes . . . be enormously expanded and its work . . . become more complex and time-consuming." The majority of the Court "doubt[ed] that this is what Congress intended in subjecting the Board to judicial review." *Charles D. Bonanno Linen Service, Inc. v. NLRB,* —— U.S. ——, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982).

I dissented from the majority's approval of the Board's "justification" in *Permanent Label*, contending in my dissent, that the Board, in order to comply with an *Armcor-Hedstrom* standard must discuss *"why* the possibility of erasing the effects of past practices and of insuring a fair election (or a fair rerun) by the use of traditional remedies, though present is slight. . . ." *NLRB v. Permanent Label Corp., supra,* 657 F.2d at 533 (Garth, J. dissenting) *quoting NLRB v. Gissel Packing Co.,* 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969) (emphasis added). I will not repeat here my dissenting discussion in *Permanent Label,* other than to state that if we are to determine whether the Board is correct in rejecting an election which is the preferred remedy, then the justification furnished to us must include more than conclusory statements and a rehash of the unfair labor practices committed by the company, all of which generally may be cured by a cease and desist order and by reinstatement of discharged employees.

In the instant case, the ALJ justified a bargaining order by discussing the serious nature of the Company's unfair labor practices, the small size of the company, the "top level" source of the unfair labor practices and the lack of effort to neutralize them. However, these reasons assembled by the ALJ do not focus on the central issue of why a fair re-election cannot be held.

The discussion of the Company's actions is no more than a reiteration of the reasons for concluding that the employer committed unfair labor practices. The fact that unfair labor practices stem from a top level source does not support a finding that a bargaining order should issue. Most, if not all, unfair labor practices by employers emanate from upper management. The fact that the Company made  no real effort to counteract the unfair labor practices is no more helpful in assessing whether a fair election is possible. Rarely, if ever, does an employer undertake counteractive measures

until the Board has made a finding of unfair labor practices and has issued a cease and desist order. Finally, although the ALJ's opinion may be correct in stating that the small size of a bargaining unit means that unfair labor practices are more likely to contaminate an election process, the decision does not discuss why, even in a small unit, a cease and desist order and an order for an election would not cure the impact of such practices.

Nowhere in the ALJ's opinion, which was summarily adopted by the Board, is there any discussion of *why* the Board's traditional remedies—an order compelling the employer to cease and desist from unfair labor practices and to reinstate discharged employees—would not be sufficient to guarantee the employees' right to select democratically a bargaining representative. There is no discussion of *why* such traditional and preferred remedies would not eliminate the impact of the Company's prior unfair practices on the fairness of a future election. Nor is there any discussion of *why* a cease and desist order would not deter the employer from committing future unfair labor practices.[1]

Our review of the Board's order is made unnecessarily difficult when the Board fails to address these issues. It must be obvious, that we cannot exercise our proper function as a reviewing court unless we are furnished with a reasoned analysis of the factors which led the Board to conclude that a fair election could not be had.

During oral argument, when counsel for the NLRB failed to explain why a cease and desist order and an election would not suffice in this case, the court, in colloquy with counsel, suggested the possibility that without such an order, an employer with a small workforce might seek to forestall unionization for a period of time by discharging employees who support the union. Without expressing any opinion on the merits of such a justification, I note first that even if

---

1.  It is obvious that the ALJ was not relying on *Permanent Label* at the time its opinion was filed. *Permanent Label* was announced on *June 30, 1981*; the ALJ's decision was issued

on July 14, 1980. Our "articulation" standard, however, was established as early as *Armcor* in 1976. Thus, little excuse exists for the failure to comply with that requirement.

valid, this reasoning, did not emanate from the Board. Second, such a *post hoc* rationalization by a reviewing court is never sufficient to justify agency action.

> [A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.

*Securities and Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

In his opinion, Judge Gibbons has supplied still another *post hoc* justification for the Board's issuance of the bargaining order. According to Judge Gibbons, "when the employer's workforce consists of four persons, one of whom is the son of the president, and the other three sign valid union authorization cards, the degree to which employees' free choice of a bargaining representative will be enhanced by a Board supervised secret ballot election is undiscernible." Opinion of Judge Gibbons, typescript at 7. This rationalization merely underscores once again the deficiencies in the Board's articulation, a deficiency which a court cannot cure.

One of the factors the Board must consider in deciding to issue a bargaining order based on valid authorization cards is whether those authorization cards represent the bargaining unit as of the time of the issuance of the proposed order. *See NLRB v. American Cable Systems, Inc.*, 427 F.2d 446 (5th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 2232, 29 L.Ed.2d 691 (1970). If the unit has undergone a dramatic expansion or change in personnel, the earlier authorization cards may no longer represent the free choice of the employees. In the instant case, despite inquiries made at oral argument, we have yet to be informed whether the two discharged employees, McClellan and Johnson will accept reinstatement or whether the employer has hired replacements for those employees. We do know that the working unit presently numbers more than one employee. Thus, it is not unlikely that the majority's decision will result, for example, in an order directing the employer to bargain with the Teamsters even though only one out of a number of employees in the current unit authorized the Teamsters to act as the bargaining representative. Indeed, all of the other *current* employees might well desire a union, but prefer a bargaining representative other than the Teamsters. Or, they may of course reject unionization altogether.

Neither the ALJ nor the Board considered the propriety of a bargaining order in light of the change in the composition of the workforce. The fact of employee turnover has been held to be a significant event which must be considered by the Board in deciding whether an election or bargaining order is the appropriate remedy. Not only must the fact of turnover be considered, but the Board's consideration must be articulated so that its reasoning may be examined by the reviewing court. *Peoples Gas System v. NLRB*, 629 F.2d 35, 45–46 & n.18 (D.C.Cir.1980). Nor indeed has the Board expressed any other justifiable reason why the cease and desist order followed by an election would not fulfill the purposes of the Labor Management Relations Act. As a consequence, I cannot join the majority in enforcing the bargaining order which the Board has imposed.

I acknowledge the emphasis Judge Adams gives in his concurring opinion to *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614–15, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969). That case established the guidelines for the Board's issuance of bargaining orders. Nevertheless, although Judge Adams correctly refers to *Gissel's* instruction that the Board's choice of remedy be given special respect by us, 395 U.S. 612 n.32, 89 S.Ct. 1939 n.32, he does not mention the context in which the Court advanced that instruction.

The Supreme Court emphasized that *elections*, not bargaining orders, are the preferred method of assuring employees' free

choice of a bargaining representative, 395 U.S. 602, 89 S.Ct. 1934, and that an anti-democratic bargaining order, by which the Board imposes a particular union upon the workforce, should not be issued unless the possibility of ensuring a fair election is slight. 395 U.S. at 614, 89 S.Ct. at 1940. It was in *this* context that the Supreme Court instructed us to give respect to the Board's choice of remedy. However, when the Board has given us no meaningful reasons to support its decision rejecting the preferred election remedy, and when evidence and reasoned findings are lacking as a predicate for the Board's choice, I suggest that the Supreme Court's instruction is inapposite. Thus, in such a case, as this one is, the Supreme Court would not require our deference nor our respect for such Board proceedings.[2]

Moreover, it appears to me that having been informed of our articulation requirements, the Board could enhance its own stature and more readily achieve its statutory objectives if it furnished the court with an explanation of its reasoning in the manner prescribed by our *Armcor-Hedstrom* standard. While it is true that sometimes the Board does succeed in securing approval of its justifications as being "sufficiently discernible for our review," Opinion of Judge Gibbons, typescript at 7, as it has in the instant case and as it did in *Permanent Label,* it is also true that there are many more instances in which enforcement of the Board's orders has been rejected due to non-compliance with our standard.

At the least, the Board's current practice of refusing to furnish the enforcing court with articulated reasoning, has led to split

decisions among the panels of this court and thus to a proliferation of *en banc* hearings with inevitable mixed results. See *NLRB v. Permanent Label Corp.,* 657 F.2d 512 (3d Cir. 1981) (en banc); *Hedstrom Co. v. NLRB,* 629 F.2d 305 (3d Cir. 1980) (in banc) (*Hedstrom II*), cert. denied, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981); *NLRB v. Armcor Industries, Inc.,* No. 77-1495 (November 15, 1978) (*Armcor II*) (unreported per curiam), (denying enforcement by an equally divided court); *NLRB v. K & K Gourmet Meats, Inc.,* 640 F.2d 460 (3d Cir. 1981); *Electrical Products Division of Midland Ross Corp. v. NLRB,* 617 F.2d 977 (3d Cir.), cert. denied, 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980); *NLRB v. Garry Mfg. Co.,* 630 F.2d 934 (3d Cir. 1980); *Hedstrom Co. v. NLRB,* 558 F.2d 1137 (3d Cir. 1977) (*Hedstrom I*); *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239 (3d Cir. 1976). Such a practice serves no purpose. To the contrary, it results in confusion, uncertainty, expense, and delay in the enforcement of the labor laws. Yet, the Board has it within its own power to correct this situation and can do so immediately.

It does not make sense to me that a Board practice which has been constantly questioned by this and other courts as to the fact and degree of compliance with established standards, should be continued to the detriment of the parties, the Board, and the reviewing courts. I strongly suggest that the time has come for the Board and the courts to end such skirmishes. This, however, can only be accomplished when the Board recognizes the problem it has created by its mechanical issuance of

---

2. Judge Adams reliance on *Vermont Yankee* to support his and the majority's position that the Board should not be required to do more than it did here is a misapplication of the principles prescribed by the Supreme Court in that case. In *Vermont Yankee* the Supreme Court held that reviewing courts could not compel administrative agencies engaging in *rulemaking* to adopt procedures prescribed by a court in addition to those provided in the Administrative Procedure Act. In the instant action, the issue is whether this court should require the Board to provide us with a sufficient explanation and articulation for its choice of remedy—i.e., a

bargaining order—in a dispute resolved through *adjudication.*

In any event, I do not regard our articulation standard to constitute an intrusion on internal Board procedures in the manner proscribed by the Supreme Court in *Vermont Yankee.* I pointed this out once before in my dissent in *Permanent Label,* 657 F.2d at 532 (Garth, J., dissenting), in which I emphasized that our standard stems from the Supreme Court's own instructions in *Gissel* and from fundamental rules of administrative law. Having expressed my views there, I do not deem it necessary to repeat them once again.

bargaining orders, *see Peoples Gas*, 629 F.2d at 46, and its intransigence in resisting compliance with the standard we have established. The Board can easily eliminate the tensions that have developed by amending its practices to conform to our requirements. In my opinion it should do so without further delay.

I respectfully dissent from the enforcement of the Board's order.